Bernita LEMON, Appellant,

v.

UNITED STATES, Appellee.

Benny L. PRINCE, Appellant,

v.

UNITED STATES, Appellee.

Nos. 86–954, 86–1378.

District of Columbia Court of Appeals.

Argued June 7, 1989.

Decided Sept. 26, 1989.

Melvin M. Dildine, Washington, D.C., appointed by the court, for appellant Lemon. Thomas K. Clancy filed a brief, for appellant Lemon.

Barbara R. Miller, Washington, D.C., appointed by the court, for appellant Prince.

Bruce Delaplaine, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell, Asst. U.S. Atty. at the time the brief was filed, and Mary Ellen Abrecht, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before FERREN, BELSON, and SCHWELB, Associate Judges.

SCHWELB, Associate Judge:

Bernita Lemon and Benny Prince were both convicted by a jury of four counts of armed robbery[1] in connection with a harrowing incident in which the victims were forced to strip naked in an apartment in Southeast Washington in the early morning hours of Sunday, March 31, 1984. Prince was also convicted of carrying a pistol without a license.[2] Of the numerous arguments presented to us in the two appellants' consolidated appeals, we address in detail only Prince's claims that the trial court committed reversible error by denying his motion for severance of defendants, that the prosecutor improperly invoked the "missing witness" doctrine against him, that he was denied his constitutional right to a speedy trial, and that he was improperly sentenced to a mandatory minimum term of imprisonment. Although we find some merit in Prince's contentions with respect to the "missing witness" issue, we conclude that, on the particular facts of this case, reversal is not required. We find Prince's other principal contentions to be plausible but, on balance, unpersuasive, and Ms. Lemon's claims to be meritless.[3] Accordingly, we affirm both appellants' convictions.

I

THE FACTS

This case had its inception in a Saturday night encounter between two groups of people. Many of the members of both groups had been drinking alcohol or using drugs or both. Unsurprisingly, there were numerous contradictions and incongruities in the testimony (most of them on collateral issues) which Prince's appellate counsel was able to bring out skillfully in her brief. Nevertheless, the principal events of the night in question emerge with reasonable clarity from the testimony.

According to the prosecution's evidence, Ms. Lemon was at her sister's house on the evening of March 30, 1984 with her friend Pamela Givens. At about midnight, she left for a short period. Upon her return, she persuaded Ms. Givens to join her in riding around in a van with two young men, later identified as Prince and his friend Reginald Nelson. The four of them eventually drove to a service station, where they encountered five of the other six *dramatis personae*, namely Phyllis Chesley, Beverly Portier, Garland Thames, Melvin Howard and Marion Foster. Following some discussion among the nine persons now present, of whom some knew each other and some did not, all of them travelled in the van for a few blocks to 242 Oakland Street, S.E., where Ms. Chesley, Ms. Portier and Melvin Howard all lived. They were met there by Melvin Howard's brother James, and they all went into the hosts' apartment, ostensibly to play cards, drink and socialize.

The party had hardly been launched when Prince suddenly pulled out a pistol and appellants announced a stick-up. They ordered all of the persons (except for their two original companions) to strip. Prince fired a shot into the wall, hitting nobody. He also struck Thames, an elderly man, in the head with the butt of his weapon. Ms. Lemon went through the victims' valuables and clothing, and she and Prince carried away a T.V. set and a number of other items, including the victims' clothes. Although there was some suggestion that they may have acted as lookouts, Ms. Givens and Nelson were for the most part depicted as passive spectators in the proceedings, neither participating in the intimidation and expropriation of the victims nor doing anything to assist them.

1. D.C.Code §§ 22–2901, 22–3202 (1981).

2. D.C.Code § 22–3204 (1981).

3. We reject Ms. Lemon's contention that she was entitled to an instruction on the "lesser included" charge of receiving stolen property. *See Stevenson v. United States,* 522 A.2d 1280, 1283 (D.C.1987); *Anderson v. United States,* 490

A.2d 1127, 1130 (D.C.1985). We also hold, contrary to the contentions of both appellants, that the indictments were not multiplicitous, *Razzaaq v. United States,* 514 A.2d 783, 784 (D.C. 1986), and that no special unanimity instruction was required. *Shivers v. United States,* 533 A.2d 258, 261–63 (D.C.1987).

After leaving the apartment, the two appellants, Ms. Givens and Nelson drove in Prince's van to an alley and threw the stolen clothes and some other items into a dumpster. After some incomplete sexual dalliances among the participants and the purchase and consumption of some cocaine, Prince gave the women the remaining proceeds of the robbery.

The victims made no immediate report of the crime after the robbers had left. Early on the following afternoon, however, Ms. Portier and Melvin Howard saw the gunman operating the van in which they had travelled on the previous day and called the police. Officers responded and stopped two vans, only to learn from the witnesses that neither vehicle was involved in the robbery. After a third van was stopped, however, Ms. Portier and Howard identified both the van and the driver, who turned out to be Benny Prince. Prince was arrested, the identity of Ms. Lemon was subsequently ascertained, and both appellants were indicted, tried and convicted.

At trial, both appellants were identified as the robbers by Ms. Givens and Ms. Chesley. Ms. Portier, Melvin Thomas and Thames also identified Prince in court.[4] A confession by Ms. Lemon, from which allusions to the identity of the gunman had been redacted, was introduced into evidence. Proof was presented that a bullet fired from a .38 caliber revolver was recovered from a plaster wall.

Ms. Lemon testified on her own behalf. She admitted participating in the robbery, which she described as having been unplanned, at least by her. She asserted that she was afraid of the gunman, and relied on a defense of duress. She admitted collecting and retaining the proceeds of the

robbery and helping to carry them away. On cross-examination by the prosecutor, she positively identified Prince as the gunman.

Prince presented defenses of misidentification and alibi. Marion Foster, one of the victims of the robbery, testified that she was positive that Prince was not the gunman. She stated that she had never seen him before coming to court. Vincent Starks, a federal protective service officer, testified that Prince and one George Cole had arrived at the home of Starks' girlfriend, Martina Smith, between 11:00 p.m. and 11:30 p.m. on the night in question and had remained there for several hours.

Prince also testified in his own behalf. He confirmed that he had given a ride home in the van to the complaining witnesses, whom he described as having been under the influence of alcohol.[5] He said he left them at about 10:00 p.m. without ever going to their apartment. Prince related that he then picked up George Cole and that they both visited the home of Martina Smith, where he remained until 2:30 or 3:00 a.m. Prince was impeached with two previous convictions.

The jury convicted both appellants of all charges, except that Prince was found not guilty of assault with a dangerous weapon on Thames.

## II

## THE DENIAL OF PRINCE'S MOTION FOR A SEVERANCE

Correctly acknowledging that the trial judge has "very considerable discretion"[6] in the matter, Prince claims that Judge Weisberg abused that discretion when he

---

**4.** Thames' identification was impeached, among other ways, by evidence that he had identified a different person at a lineup. Several of the prosecution witnesses had prior convictions or other indicia of unreliability. There was testimony, however, that Prince had been introduced to the group as "Frog." Prince's friend and alibi witness, Vincent Starks, stated that Prince was known as "Poor Frog."

**5.** Prince also claimed that Melvin Howard was drunk and said he was going to take Prince's

van. Prince said that he physically removed Howard from the vehicle.

**6.** When two or more defendants are charged with jointly committing an offense, there is a strong presumption that they will be tried together. *King v. United States,* 550 A.2d 348, 352 (D.C.1988). The trial judge has wide latitude in determining whether to grant or deny a motion for severance, and our review is limited to determining whether his discretion was abused. *Id.*

denied Prince's repeated requests that his case be severed from Ms. Lemon's. He contends that Ms. Lemon appeared to be under the influence of drugs during the trial, tainting him by association in the eyes of the jury; that he was prejudiced by the admission of a redacted version of Ms. Lemon's confession; that he and Ms. Lemon presented defenses so irreconcilable as to create a danger that he would be convicted as a result of the conflict alone; and that he was prejudiced by Ms. Lemon's testimony about his use of cocaine after the robbery. We find none of these contentions persuasive.

### A. *Ms. Lemon's demeanor.*

Ms. Lemon appeared to be sleeping, both while the jury was being selected and on several occasions after the trial began. Several prospective jurors noticed and discussed her condition during *voir dire.* At least one member of the jury which was eventually seated speculated that she might be on drugs.[7] Judge Weisberg warned Ms. Lemon that if she slept during the trial, this might well make it more probable that she would be convicted. The judge also suggested to Ms. Lemon's counsel that he "whack her on the leg" if she fell asleep "so she doesn't create a bad appearance in front of the jury."

In response to questioning by the court, Ms. Lemon reported that she was drowsy from cold medication. Judge Weisberg advised the jurors that Ms. Lemon was suffering a cold and was taking prescription medicine. He admonished them not to draw any inference against Ms. Lemon "or anyone else"[8] on account of her appearance, and directed them to report any development that would interfere with their ability to be fair.

Prince contends that the prejudice from Ms. Lemon's appearance rubbed off on him, and that "he had a right to be protected against the prejudice resulting from [her] use of drugs and stuporous condi-

tion." Whatever the merits of such a contention under some different factual scenario, however, *see United States v. Bailey,* 219 U.S. App.D.C. 67, 72, 675 F.2d 1292, 1297, *cert. denied,* 459 U.S. 853, 103 S.Ct. 119, 74 L.Ed.2d 104 (1982), it surely lacks any persuasive force here.

■ As Prince himself forcefully contends, he and Ms. Lemon were asserting irreconcilable defenses. When Ms. Lemon took the stand, she became one of the most damaging witnesses against him. On cross-examination, Prince attempted to undermine Ms. Lemon's credibility by inquiring into her use of alcohol and cocaine. If the jurors believed that Ms. Lemon was in a drug-induced torpor during trial, such a belief would logically have reinforced Prince's contention that her testimony against him was unreliable. Given these circumstances, it was not unreasonable for the judge to conclude that severance was not necessary to protect Prince from associational taint.

### B. *The redacted confession.*

During the prosecution's case-in-chief, the judge admitted a confession by Ms. Lemon from which allusions to Prince had been eliminated. Prince was referred to in the statement as "that guy" or "the gunman". Prince contends that the redaction was ineffectual because "no matter how you redact the statement, if you place it in conjunction with other references in the testimony, the inference that the person referred to was appellant [becomes] unavoidable." *See, e.g., Foster v. United States,* 548 A.2d 1370, 1371 (D.C.1988) (adopting doctrine of contextual analysis). He claims that it would not take an Einstein to determine that he was "that guy." The government argues to the contrary.

In *Ellsworth v. United States,* 300 A.2d 456 (D.C.1973), the defendant claimed that the admission of his codefendant's confession was hearsay and denied him rights secured by the confrontation clause of the

---

7. This juror was replaced by an alternate before deliberations began.

8. This was apparently an oblique reference to Prince. Like an exhortation not to think about a pink elephant, a more explicit allusion to him might well have been counter-productive.

Sixth Amendment, *citing Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The court rejected this contention:

> *Bruton* simply is inapposite to the instant case. Here, Wallace took the stand, affirmed the statement, and was in fact subjected to vigorous cross-examination by appellant's counsel, and as the Court later held in *Nelson v. O'Neil*, 402 U.S. 622, 627, 91 S.Ct. 1723, 1726, 29 L.Ed.2d 222 (1971): "The Constitution as construed in *Bruton* ... is violated *only* where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for 'full and effective' cross examination." [Emphasis in original.]

*Id.* at 458. *See also* 8 MOORE'S FEDERAL PRACTICE § 14.06[2] at 14–68 (1989).

Prince concedes that *Bruton* is inapplicable and that the confrontation clause was not violated. He argues, however, that Ms. Lemon's confession was nevertheless hearsay as to him. *See Carpenter v. United States*, 430 A.2d 496, 502 (D.C.1981) (*en banc*) (trial judge must take appropriate steps to minimize prejudice inherent in co-defendant confessions which are hearsay as to the defendant, even where the codefendant has testified and no confrontation clause problem is presented). In the present case, however, the initial redaction of the confession, coupled with Ms. Lemon's adoption of the substance of the statement in her live testimony and Prince's opportunity to cross-examine, rendered negligible the possibility of any substantial prejudice to Prince. In *Ellsworth* and *Carpenter, supra*, the same hearsay problem existed, but the convictions were nevertheless affirmed. In each of these cases, it was held that the denial of a severance was within the trial judge's discretion. This case is not appreciably different.

## C. *Irreconcilable defenses.*

Ms. Lemon's defense was that she participated in the robbery under duress from Prince. Prince's defense was that he was not there. These defenses cannot be reconciled. *See, e.g., Ready v. United States*, 445 A.2d 982 (D.C.1982). Prejudice from joinder of defendants may arise "where the defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that *this conflict alone* demonstrates that both are guilty." *Rhone v. United States*, 125 U.S. App.D.C. 47, 48, 365 F.2d 980, 981 (1966) (emphasis added); *see also Tillman v. United States*, 519 A.2d 166, 170 (D.C. 1986).

In the present case, Prince was identified by several witnesses, some of whom were previously acquainted with him and could hardly have misidentified him by accident. Two of them recognized both him and his van on the day after the robbery. His own testimony connected him with his accusers at a time shortly before the robbery, and effectively drove the final nails into his coffin. He admitted that he drove the victims from the gas station to the apartment on Oakwood Street. There was general agreement among the witnesses, except Prince himself, that the driver entered the apartment, pulled a gun and, with Ms. Lemon's help, committed the robbery. There was no evidence that any man other than the driver entered the apartment and robbed the victims.[9] Moreover, Prince was introduced to the victims by a nickname which a defense witness confirmed was his. We conclude that the case against Prince was compelling, and that there was certainly "enough independent evidence of appellant's guilt—beyond that required for the government to survive a motion for acquittal—so that the court reasonably could find, with substantial certainty, that the conflict in defenses alone would not sway the jury to find appellant guilty." *Ready, supra*, 445 A.2d at 987.[10]

---

9. Although defense witness Marion Foster testified that Prince was not the gunman, she acknowledged that the driver and the gunman were one and the same.

10. Moreover, if a severance had been granted, any prudent prosecutor would have sought to try Ms. Lemon first. If Prince's trial had then been deferred until after Ms. Lemon had been sentenced, she would have been available as a witness against him in any event.

### D. *Use of cocaine.*

Ms. Lemon testified that, following the robbery, she, Prince, Ms. Givens and Nelson snorted cocaine together. She related that thereafter Prince kept some of the cocaine. Prince contends that this was "other crimes" evidence which would have been inadmissible if he had been tried alone, *Drew v. United States*, 118 U.S.App. D.C. 11, 331 F.2d 85 (1964), that Ms. Lemon had the absolute right to testify in her own defense, and that a severance should therefore have been granted to avert prejudice to him. The government responds that the testimony was not "other crimes" evidence at all, that it was admissible to complete the story of the crime on trial by proving its immediate context of happenings near in time and place, *Green v. United States*, 440 A.2d 1005, 1007 (D.C.1982); that the evidence of cocaine use was "inextricably intertwined" with evidence of the robbery, *Toliver v. United States*, 468 A.2d 958, 961 (D.C.1983), and alternatively that the purchase of cocaine was admissible to show a probable motive for the robbery. *See Bigelow v. United States*, 498 A.2d 210, 213 (D.C.1985).

Although we have difficulty in appreciating why the cocaine use was "intertwined" with the robbery or why any supposed intertwining was "inextricable," we need not resolve the *Drew–Green–Toliver–Bigelow* issues. The cocaine use occurred after the robbery. There is no doubt that the gunman in the robbery and the man who later allegedly used cocaine with Ms. Lemon and the others were one and the same individual. For the jurors to have believed that Prince used cocaine in the alley, they must first have been persuaded that he was the armed robber who drove there in his van. If he was not the robber, he was not the man who used the cocaine.

The rule presumptively excluding evidence of other crimes is deemed necessary to avoid the danger that the jurors will give undue weight to such evidence in determining that the defendant committed the offense charged, or that they will condemn him as a bad man irrespective of his guilt in the case before them. *See Thompson v.*

*United States*, 546 A.2d 414, 418–19 (D.C. 1988). These considerations may not come into play in a situation where, as on the evidence presented here, the jurors can only conclude that the defendant committed the "other crime" if he was guilty of the principal charge. However, even assuming, *arguendo*, that the admission of the evidence as to cocaine use was erroneous vis-a-vis Prince, we nevertheless conclude, in light of the sequence of events on the night in question, that such error was harmless and that it does not require us to reverse Prince's conviction for denial of his motion for severance. On these facts, the evidence about the purchase and use of cocaine lacked any potential for significant prejudice.

\* \* \*

As we have noted at p. 1370, *supra,* the trial judge's discretion with respect to joinder and severance is broad. We discern no abuse.

### III

### THE MISSING WITNESS ISSUE

### A. *The cross-examination and closing argument.*

Prince's defense at trial was that, at the time the robbery allegedly occurred, he was at the home of Martina Smith, in the company of Ms. Smith, Vincent Starks, George Cole, Reginald Nelson, and several other people. Starks was the only one of these individuals who testified on Prince's behalf. Understandably, but perilously in the light of our precedents, the prosecutor wanted to impress upon the jury the notion, surely compatible with common sense, that a falsely accused man facing life imprisonment would do everything reasonably possible to secure testimony corroborating his alibi from at least some of these individuals. Unfortunately, the prosecutor's method of urging this notion to the jury transgressed what this court has found to be permissible, especially without prior leave from the trial judge.

During Starks' testimony on Prince's behalf, the prosecutor questioned him about the whereabouts of George Cole. The

judge permitted the questioning on the strength of the prosecutor's representation that the government did not know where Cole was and that he wanted to talk to him. Prince's counsel made it clear that Cole had a criminal record and that the defense would not call him as a witness. Counsel offered, however, to produce Cole and Martina Smith in court, so that they would be available to the government. Counsel's obvious and legitimate purpose was to forestall the possibility of a missing witness instruction or argument against his client. With Judge Weisberg's approval, both Cole and Ms. Smith were brought to the witness room and their presence was made known to the jury.

In spite of this, the prosecutor repeatedly questioned Prince on cross-examination about the persons present at Ms. Smith's house, particularly Cole, and why Prince was not calling them as witnesses. Indeed, the prosecutor reverted to this theme so often that the judge eventually directed him to go on to something else. Prince's attorney made several objections, but none was specifically directed to the missing witness issue.[11] During a discussion of proposed jury instructions outside the presence of the jury, the judge inquired if the prosecutor would be requesting a missing witness instruction, and the prosecutor said he would not. He did not ask the judge for permission to include a missing witness contention in his closing argument.

It was in this context, with "missing witness" ostensibly out of the case, that the prosecutor commented in his initial closing argument that although Prince had claimed to be at a gathering with good friends and casual friends,

> he comes up with one witness. Of all the people, he asks one person, Vincent Starks, to be his alibi witness.

In deference to the trial judge's preference that interruption of closing argument be avoided if possible, Prince's counsel made no contemporaneous objection.

In his closing argument, Prince's counsel commented that, as the jury well knew, both Cole and Martina Smith were in the witness room, and that although it was the government's burden to rebut the alibi defense, the prosecutor had called neither Cole nor Ms. Smith to testify. On rebuttal, the prosecutor expanded, with considerably more pizazz, his commentary on absent witnesses:

> Ask yourselves, ladies and gentlemen, what's the first thing you would do? You would get on the phone. You would get on your bike. You would get in your car. You would get in your orange van with decals, and you would round up your witnesses; wouldn't you, because you knew that you were not guilty of a crime, and you'd bring them into court and you'd have them testify.
>
> Well, is that what Benny Prince did? We didn't hear from Willie. We didn't hear from Rodney. We didn't hear from George Cole. And, of course, we didn't hear from the other four people that neither Vincent or Benny can remember.

. . . . .

> And after all of that, [Prince's attorney] says, "Why didn't we call George Cole?" What in God's name do we want to call George Cole for? Why would we put on a witness who is going to tell something that's not true, whose testimony, if it's what Mr. Prince would have you believe it is, is completely contrary to all the evidence in the case.
>
> What rational, conceivable purpose would we have to put on someone who is at a party that the evidence shows Benny Prince was never at. What sense does that make, ladies and gentleman?

Prince's counsel again made no contemporaneous objection while these remarks were being made. After the rebuttal argument had been completed, however, he made a series of objections. He never mentioned the "missing witness" doctrine by name, but did argue that

---

11. Counsel did claim that the prosecutor was attempting to shift the burden of proof by asking Prince if his case would not have been stronger if he could secure more witnesses' testi-

mony in support of his alibi. The judge sustained the objection and stated his agreement with the defense contention.

those are not only comments on the evidence, but it's a shifting of the burden in many places where he says, things don't make sense; he could have had them testify; how ludicrous is that? And I would note these objections for the record.

The judge overruled the objection, stating that

nothing Mr. Levan said in his opening argument or in his rebuttal argument was objectionable in any way.

## B. *Legal discussion.*

Almost a century ago, the Supreme Court articulated the "missing witness" doctrine as follows:

if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not creates the presumption that the testimony, if produced, would be unfavorable.

*Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893). In the present case, no missing witness instruction was requested or given. The question is whether the prosecutor's cross-examination and argument relating to Prince's failure to call certain witnesses requires reversal of his conviction.

In *Lawson v. United States,* 514 A.2d 787, 789 (D.C.1986), this court stated that

[b]efore a party may argue an adverse inference as to an absent witness, counsel must seek permission from the court, and the court must determine (1) that the witness in question is peculiarly available to the party against whom the inference is sought, and (2) that the witness' testimony would have elucidated the transaction at issue.

*Accord, Price v. United States,* 531 A.2d 984, 993 (D.C.1987). These two preconditions must also be met before counsel makes what has become known as an "in-

complete" missing witness argument by noting the absence of a witness without asking the jury to infer that such testimony would have been adverse to the opposing party. *Arnold v. United States,* 511 A.2d 399, 415–16 (D.C.1986); *accord, Price, supra,* 531 A.2d at 993. The application of these preconditions in such circumstances is predicated on the belief that, even where no adverse inference is expressly requested, the effect of the "incomplete" argument is substantially the same as that of a more explicit one. *Lawson, supra,* 514 A.2d at 790. Most recently, in *Price,* this court held that cross-examination of a party as to why he failed to call certain alibi witnesses, operates "in much the same manner" as an "incomplete" missing witness argument, and may not be undertaken without prior leave of court.

In light of these decisions, we are of the opinion that the prosecutor's cross-examination and closing argument, and especially his rebuttal, would require prior leave of court if the case were being tried today. This trial, however, took place a few months before *Arnold,* and we stated in *Arnold* that "because the law was uncertain, we cannot fault the prosecutor for failing to seek permission in advance to make an incomplete missing witness argument." *Id.,* 511 A.2d at 416. Accordingly, *Arnold* has not been applied retroactively. *See also Vines v. United States,* 540 A.2d 1107, 1108 n. 1 (D.C.1988); *Singletary v. United States,* 519 A.2d 701, 702 (D.C. 1987).

Aside from the question whether prior consent of the court was required, however, we conclude that the prosecutor's argument was improper. Cole and Ms. Smith were not "peculiarly available" to the defense; indeed, as Prince's attorney correctly argued, they were in the witness room and readily available to the prosecution.[12] There is no indication in the record that

---

12. There is another reason for concluding that a missing witness argument was inappropriate as to Cole. As this court recently stated in *Brown v. United States,* 555 A.2d 1034, 1037 (D.C.1989), in reiterating that the missing witness doctrine should be applied with caution:

if a lawyer in preparation for trial discovers that a possible witness, because of a prior criminal record or unpleasant personal characteristics, would be an embarrassment, his failure to call him should not result in a prejudicial ruling against his client.

Cole had a prior criminal record.

Reginald Nelson, Prince's companion in the van, was more available to the defense than to the government.[13] Thus, even assuming without deciding that one or more additional alibi witnesses could "elucidate the transaction" and would not be cumulative,[14] there was no legitimate basis for making a "limited" missing witness argument with respect to individuals who were in the jury room ready to be called.

 In cases of improper missing witness argument, it is often difficult for an appellate court to determine with the requisite level of certainty that the defendant was not prejudiced, and reversal is ordinarily appropriate. *Lawson, supra,* 514 A.2d at 792; *Thomas v. United States,* 447 A.2d 52, 59 (D.C.1982). Moreover, in the present case, cross-examination of Prince and Starks and the prosecutor's remarks during his initial closing argument and rebuttal, taken together, come close to a "complete" missing witness argument. The prosecutor at least implied that the individuals with whom Prince claimed to have spent the evening were not called as witnesses because they would not confirm Prince's version of events.

Nevertheless, we conclude that reversal is inappropriate here. Appellate courts review for error by judges, not by prosecutors. To be sure, such error may embrace not only incorrect rulings but also, on occasion, failure to intervene *sua sponte* when such intervention is called for. *United States v. Jenkins,* 140 U.S.App.D.C. 392, 397, 436 F.2d 140, 145 (1970). In the present case, even at the conclusion of closing argument, Prince's counsel did not expressly invoke the missing witness doctrine.[15] But even if the objection by Prince's counsel is deemed sufficient, reversal is not called for.

As we have noted at pp. 1372–1375, *supra,* in our discussion of conflicting defenses, the identification evidence against Prince, coupled with his own testimony regarding his contact with the victims, was overwhelming. The absence from the witness stand of all but one of the persons who were supposed to have been with Prince[16] on the night of the crime would have been obvious to the jury no matter what the prosecutor said, and the judge correctly instructed the jury that the government had the burden of proof beyond a reasonable doubt and that the defendant had no obligation to prove anything. Under these circumstances, we are satisfied that the prosecutor's improper missing witness argument was not the cause of Prince's conviction and that any error was harmless.

## IV

## SPEEDY TRIAL

 Prince was arrested on April 3, 1984. He was tried in February 1986. He now argues that he was denied the right to a speedy trial guaranteed by the Sixth Amendment, and asks us to reverse his conviction and order the dismissal of the indictment with prejudice.

In evaluating this claim, we must consider four factors: the length of the delay, the reason for the delay, the defendant's assertion of his right, and prejudice. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2192, 33 L.Ed.2d 101 (1972); *Graves v. United States,* 490 A.2d 1086, 1090–91 (D.C.1984) (*en banc*), *cert. denied,* 474 U.S. 1064, 106 S.Ct. 814, 88 L.Ed.2d 788 (1986). We discuss each factor in turn.

#### A. *Length of the delay.*

Twenty-two months elapsed in this case between arrest and trial. As this court stated in *Graves, supra,*

---

13. According to Prince's brief on appeal, Nelson had been interviewed by the police and subpoenaed to the grand jury.

14. *Compare Cooper v. United States,* 415 A.2d 528, 534 (D.C.1980) with *Brown v. United States, supra,* 555 A.2d at 1036 and *Shelton v. United States,* 388 A.2d 859, 864 (D.C.1978).

15. For the reasons we have stated, however, we do not agree with the trial judge's remark that there was "nothing whatever" objectionable in the prosecutor's closing.

16. The jurors were also aware that Ms. Smith and Cole were in the witness room and that either side could have called them.

a delay of more than a year gives prima facie merit to a claim that an accused has been denied the right to a speedy trial, creates a presumption of prejudice, and shifts the burden to the government to justify the delay. Moreover, the government's burden in arguing that no violation has occurred increases in proportion to the length of the delay.

*Id.* at 1091.

The passage of time alone, however, is not dispositive. *See Head v. United States,* 451 A.2d 615, 619–22 (D.C.1982) (delay of almost thirty months, including one month's pretrial incarceration); *Day v. United States,* 390 A.2d 957, 964–73 (D.C. 1978) (thirty-two and a half month delay; defendant incarcerated on other charges). The more serious and complex the charge, the greater is the delay that will be tolerated. *Graves, supra,* 490 A.2d at 1091. The present case, involving two defendants and four robbery victims, was both serious and relatively complex.

B. *Reasons for the delay.*

Much of the delay in this case was institutional in nature. It took four months, not an unreasonable time, for the government to secure an indictment in August 1984. A status hearing was held two months later, and the trial was initially scheduled for February 1985, ten months after Prince's arrest. Three months of subsequent delay occurred when the judge was in trial on a scheduled trial date with an even older case. This court has explained that considerations such as court congestion count against the government in the speedy trial calculus, but should be "weighted less heavily" than a deliberate or otherwise culpable attempt to delay the trial. *Graves, supra,* 490 A.2d at 1092.

There were, however, three continuances granted at the request of the government

which are somewhat more troubling. On February 26, 1985, the prosecutor sought a postponement of the trial, which was scheduled two days later, because of the complexity of the case and the incompleteness of the government's investigation.[17] Prince's counsel also claimed that the government had been less than forthcoming in responding to his requests for discovery. The trial was continued until an agreed date of May 13, 1985.

The government moved for a second continuance in advance of the new trial date because one of its witnesses was on military leave. Such delay is attributable to the prosecution, for it was the government's responsibility to assure the availability of its witnesses before agreeing to the trial date. The case was continued until July 26, 1985.

The prosecutor requested a brief delay in advance of the July trial date—one or two days—because he was completing another trial. The judge asked counsel for both defendants whether they wished to carry the case from Friday to Tuesday or to continue it; each preferred a continuance. The trial was rescheduled for October 23, 1985, at which time the judge was presiding over an even older case. The trial finally began in February 1986.

We conclude that the first two government continuances and at least a few days of the third were "significantly" attributable to the government.[18] There is little or no evidence of deliberate foot-dragging, but some modest measure of culpability. Of the twenty-two months of delay, the government was significantly responsible for approximately one third.

C. *Assertion of the right.*

Prince did not demand a speedy trial, at least in so many words, until the case was

---

**17.** Despite its motion, the government announced "ready" on the trial date, but nevertheless requested an order (for the first time on that day) that Prince submit to a palm print by the Police Department. We find the announcement of readiness unpersuasive under these circumstances.

**18.** "Significant" delay is an intermediate category for government conduct "deemed less culpable than deliberate foot-dragging to gain tactical advantage but more culpable than the neutral category exemplified by failure to advance trial dates due to court congestion." *Graves, supra,* 490 A.2d at 1092.

eighteen months old.[19] He did announce ready on various trial dates, however, and opposed the government's requests for continuances, although perhaps not, in light of the foregoing recitation, quite as firmly or unambiguously as he might have done. "While invocation of this important right is not dependent on the uttering of court-ordained incantions, we have made it clear that the credibility of an accused's assertion of the right is enhanced by ... a direct statement [that he seeks a speedy trial]." *Graves, supra,* 490 A.2d at 1098.[20] On the whole, we think that Prince asserted his right, but with more circumspection than zeal, perhaps because he was at liberty before trial but knew that he might not be thereafter.

### D. *Prejudice.*

As this court explained in *Graves,*

> [t]he final factor, prejudice to the defendant, is to be assessed in the light of the interests which the speedy trial right was designed to protect, namely: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused, and (3) limiting the possibility that the defense will be impaired. *Barker, supra,* 407 U.S. at 532, 92 S.Ct. at 2193. "Of these," the Supreme Court said in *Barker,* "the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Id.*

490 A.2d at 1101. *See also United States v. MacDonald,* 435 U.S. 850, 858, 98 S.Ct. 1547, 1551, 56 L.Ed.2d 18 (1978).

Prince was not incarcerated pending trial. Some anxiety and concern is inevitable when a defendant awaits his day in court on charges for which he can be sentenced to life imprisonment. As in *Graves,* however,

> there is no contention here that the alleged anxiety and concern had a specific impact on appellant's health or personal or business affairs. [Citations omitted.] Moreover, appellant had prior experience with the criminal justice system, having been convicted [twice][21] previously, a factor which may have tended to minimize his anxiety.[22]

490 A.2d at 1104.

Prince claims prejudice in that "by the time of trial, [alibi witness] Starks was no longer able to remember the exact details of the get-together at his girl friend's apartment," and that counsel was forced to refresh Starks' recollection with an earlier written statement. He notes that the prosecutor attacked Starks' testimony because Starks did not remember the date of the gathering or the day of the week on which it occurred.

Prejudice of this kind is a double-edged sword. As we have noted, the defense made much of discrepancies in the accounts given by the prosecution witnesses. The passage of time may well have contributed to the confusion exhibited by some of them. We will never know whether witnesses on one side or the other would have had a better recollection if the case had been tried eight months or twelve months or

---

**19.** When Prince did make the demand, it was in conjunction with his request for a severance when Ms. Lemon's attorney was unavailable. If he had been tried before Ms. Lemon, she would not have been in a position to testify against him. There was therefore an obvious tactical incentive for his demand.

**20.** Prince did not file a motion in the trial court to dismiss the indictment for lack of a speedy trial. We have never held that this constitutes a waiver of the right (as it does in federal prosecutions, *see* 18 U.S.C. § 3162(a)(2)). *But see Jackson v. United States,* 503 A.2d 1225, 1228–29 (D.C.1986). The practical result of the failure to file such a motion is that we, as an appellate court, must decide the question without the benefit of findings by the trial judge, who had the

case on his calendar for a significant period and must surely have had a better "feel" for it than is available from a cold record. A defendant demanding a speedy trial should not, of course, be content with moving for dismissal and should affirmatively request an early date. *See Graves, supra,* 490 A.2d at 1098. The filing of a motion to dismiss at a time when the trial judge can meaningfully consider it will substantially improve the record available to this court, and is desirable for that reason.

**21.** Graves had three prior convictions.

**22.** We are constrained to acknowledge, however, that placidity is not a universal characteristic of all recidivists.

fifteen months (rather than twenty-two months) after Prince's arrest. The fact that memories fade is one of the major reasons for the constitutional guarantee of a speedy trial. Where, as here, the delay is almost two years, the quality of justice is not enhanced.

Nevertheless, we do not believe that Prince was significantly prejudiced. Since he was released following his arrest, he was "free during the delay to consult with counsel and potential witnesses and gather the evidence needed for his defense." *Reed v. United States*, 383 A.2d 316, 320 (D.C.), *cert. denied*, 439 U.S. 871, 99 S.Ct. 203, 58 L.Ed.2d 183 (1978). He was arrested on the day after the crime, and claimed to know where and with whom he was at the time the crime was allegedly committed. The recollections of all potential alibi witnesses could have been promptly memorialized. Prince acknowledges that he "cannot point to a specific piece of exculpatory evidence which was lost or a defense witness who died or disappeared because of the inordinate pretrial delay." Although such a showing may not always be indispensable, *cf. Sells v. United States*, 525 A.2d 1017, 1025–27 (D.C.1987),[23] the lack of specific evidence of prejudice is significant in light of the particular circumstances here.

### E. *The balance.*

The delay in this case is regrettable. The government was significantly responsible for some of it. The defendant in some measure objected to it. The balancing process is a difficult and sensitive one, *Barker, supra,* 407 U.S. at 533, 92 S.Ct. at 2193, particularly where, as here, we do not have the benefit of findings by the trial judge. Nevertheless, in the absence of any persuasive showing of specific prejudice beyond that presumed from the delay itself, and in light of the less than vigorous assertion of the right, we conclude that Prince has not made the kind of showing that would warrant dismissal with prejudice of an indictment for this complex, grave and brutal crime.

## V

## THE MANDATORY MINIMUM

In the autumn of 1982, our citizens were in an angry frame of mind towards armed criminals and drug dealers who were victimizing innocent persons in this then (as now) lovely but beleaguered capital. On September 14, 1982, they adopted by 72% to 28% an initiative providing for severe mandatory minimum sentences for, among others, persons who committed offenses while armed with a pistol or firearm. *See United States v. Rogers*, 115 Daily Wash. L.Rptr. 221 (Super.Ct.D.C.1987), describing the history of the initiative. As one proponent of mandatory minimum sentencing wrote in the Washington Post shortly before election day,

> In 1979, pistols killed 10,728 Americans. That same year, there were 52 pistol deaths in Canada, 58 in Israel, 42 in West Germany, 48 in Japan, 34 in Switzerland, 21 in Sweden, and 8 in Britain.

Perazich, *For Mandatory Sentences*, Washington Post, September 5, 1982. The voters hoped, apparently in vain, that mandatory sentences would reduce the carnage.

The changes wrought by this initiative are now codified in pertinent part in D.C. Code § 22–3202(a) (1988 Supp.), which provides as follows:

> § 22–3202. Additional penalty for committing crime when armed.
>
> (a) Any person who commits a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm (or imitation thereof) or other dangerous or deadly weapon (including a sawed-off shotgun, shotgun, machine gun, rifle, dirk, bowie knife, butcher knife, switchblade knife, razor, blackjack, billy, or metallic or other false knuckles):
>
> (1) May, if he is convicted for the 1st time of having *SO* committed a crime of violence in the District of Columbia, be sentenced, in addition to the penalty provided for such crime, to a period of im-

---

**23.** As the court stated in *Sells*, "fifty-one months in a simple case is extreme delay." *Id.* at 1027.

prisonment which may be up to life imprisonment *and shall, if convicted of SUCH offenses while armed with any pistol or firearm, be imprisoned for a mandatory-minimum term of not less than 5 years; and*

(2) Shall, if he is convicted more than once of having *SO* committed a crime of violence in the District of Columbia, be sentenced, in addition to the penalty provided for such crime, to a minimum period of imprisonment of not less than 5 years and a maximum period of imprisonment which may not be less than 3 times the minimum sentence imposed and which may be up to life imprisonment *and shall, if convicted of SUCH second offense while armed with any pistol or firearm, be imprisoned for a mandatory-minimum term of not less than 10 years.*

(Emphasis added; block capitals used to highlight key words *SO* and *SUCH*).

Prince had previously been convicted of assault with a dangerous weapon, but it was not shown that this weapon was a pistol or firearm. He now contends that the mandatory ten-year minimum applies only where the defendant was armed with a pistol or firearm while committing both the second offense and the predicate offense.

The resolution of this issue requires a careful analysis of the language and structure of the statute. The reader will note that sub-section (a)(1) deals with first time armed offenders and sub-section (a)(2) with repeat armed offenders. Each numbered sub-section contains a provision which predated the 1982 initiative, which is followed by italicized language prescribing mandatory minimum sentences in conformity with that initiative. The issue before us turns largely on the significance of the words *SO* and *SUCH*, which we have placed in block capitals for the reader's ready reference.

Turning first to sub-section (a)(1), the word *SO* necessarily refers in context to the use of *any* dangerous weapon listed in sub-section (a), and is not restricted to the crimes of violence committed with a pistol or firearm. The word *SUCH* in sub-section (a)(1) likewise refers to a crime committed with any dangerous weapon; if it did not, the words that follow—*while armed with any pistol or firearm*—would be superfluous.

Turning now to sub-section (a)(2), under which Prince was sentenced, the use of the word *SO* again refers to the commission of a crime of violence with any sub-section (a) weapon. The sentence containing the word *SO* predated the italicized language in sub-section (a)(1), and therefore could not refer only to crimes committed with a pistol or firearm, a phrase which was added to sub-section (a)(1) later. This is the context in which we must construe the last sentence of sub-section (a)(2), which provides that a person who has been convicted more than once of a crime of violence

shall, if convicted of *SUCH* second offense while armed with any pistol or firearm, be imprisoned for a mandatory minimum term of not less than ten years.

Since *SO* and *SUCH* are used three times earlier in the statute to refer to a crime of violence committed with *any* weapon, it appears improbable that the drafters intended, for the first time, to refer to crimes of violence committed with a pistol or firearm as the antecedent of the word *SUCH* in sub-section (a)(2). We agree with the government that if the drafters had intended the reading of the statute which Prince asks us to adopt, the relevant provision would require the ten year mandatory minimum for a defendant

if convicted *more than once* of such an offense while armed with a pistol or firearm.

The drafters' failure to include a qualifier of this kind, as well as the structure of the statute, persuade us that the use of the word *SUCH* in the last sentence of subsection (a)(2) was designed to refer to predicate crimes of violence committed with any sub-section (a) weapon, and that the ten year mandatory minimum therefore applies whenever the *second* crime of violence was committed with a pistol or firearm.[24]

In *Grant v. United States*, 509 A.2d 1147 (D.C.1986), this court described the

---

**24.** As a practical matter, if we adopted Prince's proposed construction, a defendant who com-

initiative with which we are dealing here as "a part of a sentencing scheme designed to restrict a judge's discretion for certain violent crimes and drug offenses." *Id.* at 1153. The court also stated that "the statutory meaning of a term must be derived from consideration of the entire enactment against the backdrop of its policies and objectives." *Id.* at 1153–54. Mandatory minimum sentences are tough; some courts which have sustained their constitutionality have expressed reservations about their wisdom. *See, e.g., Commonwealth v. Jackson,* 369 Mass. 904, 912, 344 N.E.2d 166, 171 (1976); *United States v. Rogers, supra.* Nevertheless, courts are not free to read artificial loopholes into such laws in order to alleviate their rigor. *See, e.g., Ex parte United States,* 242 U.S. 27, 42, 37 S.Ct. 72, 74, 61 L.Ed. 129 (1916); *State ex rel. Sonner v. Shearin,* 272 Md. 502, 518–19, 325 A.2d 573, 582 (1974).

On the other side of the scale, we must of course consider the rule of lenity, which provides that criminal statutes should be strictly construed and that genuine ambiguities should be resolved in favor of the defendant. *See Henson v. United States,* 399 A.2d 16, 20–21 (D.C.1979). This principle of statutory construction applies not only to interpretations of the substantive ambit of criminal proscriptions, but also to the penalties they impose. *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980). The rule of lenity does not, however, require courts to give criminal statutes their narrowest possible interpretation. *United States v. Bramblett,* 348 U.S. 503, 509–10, 75 S.Ct. 504, 508, 99 L.Ed. 594 (1955). It cannot substitute for common sense or the policy underlying a statute. *United States v. Standard Oil Co.,* 384 U.S. 224, 225, 86 S.Ct. 1427, 1428, 16 L.Ed.2d 492 (1966). "It can tip the balance in favor of criminal defendants only where, exclusive of the rule, a penal statute's language, structure, purpose and legislative history leave its meaning genuinely in doubt." *United*

*States v. Otherson,* 637 F.2d 1276, 1285 (9th Cir.1980). We do not think that such a genuine doubt exists in this case.

■ There is still another complication. According to the "summary statement" made available to voters at the polls, the initiative

provides that persons convicted of committing crimes of violence while armed with a firearm shall be sentenced to mandatory-minimum terms of five years for first offenses and ten years for second offenses.

Material in an official voters' pamphlet may be considered by the court in determining the purpose of legislation adopted by the initiative process. *Washington State Dep't of Revenue v. Hoppe,* 82 Wash.2d 549, 552, 512 P.2d 1094, 1096 (1973). This is because the "collective intent" of the people becomes the object of the court's search where a law is enacted in this manner. *Id.*

■ More readily than the statute, the summary statement could be construed as meaning that both the predicate offense and the second offense must have been committed with a firearm for the ten-year mandatory minimum to apply. Theoretically, some voters who favored a ten-year mandatory minimum for a second crime of violence committed with a firearm might have voted "No" if they had thought that such a mandatory minimum would apply even if the predicate offense was committed while the offender was armed with a different dangerous weapon.

As Prince acknowledges in his brief, however, we can only speculate as to what the voters intended. The difficulties inherent in discerning the collective intent of a legislative body in enacting a law which is "frequently the product of compromise, of collective decisionmaking, and of mixed motivation," *Washington v. Davis,* 426 U.S. 229, 253, 96 S.Ct. 2040, 2054, 48 L.Ed.2d 597 (1976) (Stevens, J., concurring), are even more pronounced where the decision was made directly by the electorate. There is no evidence that, during the initiative

---

mitted a crime of violence with a pistol for the first time would be subject to the same mandatory-minimum sentence as one who did so following an earlier crime of violence with a switchblade knife. Although it is theoretically possible that this is what was intended, we think it improbable.

process, anyone ever raised the issue presented here, and the overwhelming vote in favor of the initiative forecloses any realistic possibility that the result would have been different if the summary statement had been drafted more precisely. Accordingly, we agree with Judge Weisberg that the ten-year mandatory minimum provision applies to Prince's crimes.[25]

### VI

### CONCLUSION

For the foregoing reasons, the judgments appealed from must be and each is hereby

*Affirmed.*

**In re S.K. and V.L., Appellants.**

No. 87–1063.

District of Columbia Court of Appeals.

Argued Feb. 9, 1989.
Decided Oct. 13, 1989.

Karen M. Stram, Washington, D.C., appointed by the court, for appellant V.L.

Charles A. Moran, Washington, D.C., appointed by the court, for appellant S.K.

Mary L. Wilson, Asst. Corp. Counsel, with whom Frederick D. Cooke, Jr., Corp. Counsel at the time, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief for appellee.

Before ROGERS, Chief Judge, and STEADMAN and SCHWELB, Associate Judges.

25. Although the trial judge was unable to locate in the court jacket the enhancement papers which were required to be filed there pursuant to D.C.Code § 23–111(a)(1) (1981), he found af-

ter a conscientious inquiry that they had in fact been served and filed. We discern no error in that determination.