**AMALGAMATED TRANSIT UNION, et al., Appellants,**

v.

**Samuel K. SKINNER, Secretary of Transportation, et al., Appellees.**

**TRANSPORT WORKERS UNION OF AMERICA, AFL–CIO, et al., Appellants,**

v.

**Samuel K. SKINNER, Secretary of Transportation, et al., Appellees.**

**RAILWAY LABOR EXECUTIVES' ASSOCIATION, et al., Appellants,**

v.

**Samuel K. SKINNER, Secretary of Transportation, et al., Appellees.**

**Nos. 89–5380, 89–5381 and 89–5384.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 14, 1989.

Decided Jan. 19, 1990.

Robert M. Weinberg, with whom Bruce R. Lerner, Earle W. Putnam, Washington, D.C. and Leo E. Wetzel, were on the brief for appellants, Amalgamated Transit Union, et al., in No. 89–5380.

Arthur M. Luby, Washington, D.C., entered an appearance for appellants, Transport Workers Union of America, AFL–CIO, et al., in No. 89–5381.

Lawrence M. Mann, Washington, D.C. entered an appearance for appellants, Railway Labor Executives' Ass'n, et al., in No. 89–5384.

Stuart M. Gerson, Asst. Atty. Gen., Dept. of Justice, with whom Jay B. Stephens, U.S. Atty., Leonard Schaitman, John C. Hoyle and Wendy M. Keats, Attys., Dept. of Justice, Diane R. Liff, Asst. Gen. Counsel and Trudy B. Levy, Asst. Chief Counsel, Dept. of Transp., Washington, D.C., were on the brief for appellees in Nos. 89–5380, 89–5381 and 89–5384.

Before WALD, Chief Judge, and EDWARDS and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

In December 1988, the Urban Mass Transportation Administration ("UMTA") issued regulations to require recipients of federal mass transit funds to implement an anti-drug program for employees who perform sensitive safety functions.[1] The required anti-drug program would include urinalysis testing of employees prior to employment, after an accident, when reasonable suspicion of drug use exists, randomly, and before returning to duty after a positive drug test. The rule was intended "to ensure a drug-free transit workforce and to eliminate drug use and abuse in the public transit industry." 53 Fed.Reg. at 47,156.

Labor organizations, and individual transit employees who would be subjected to drug testing under the regulations ("Amalgamated" or "Unions"), filed suit in district court. They challenged UMTA's statutory authority to impose a federally-designed, comprehensive drug testing program on all recipients of federal mass transit money.[2] In ruling against the Unions on cross-motions for summary judgment, the district court concluded that UMTA had the authority to specify the particular elements of a plan to deal with an identified safety hazard. The district court found nothing in the Urban Mass Transportation Act ("UMT Act" or "the Act") to preclude UMTA from proceeding through rulemaking rather than through individual adjudication to articulate the prerequisites to approval of a safety plan. The court concluded that to hold otherwise would "impermissibly elevate form over substance." Memorandum

---

1. Final Rule, Control of Drug Use in Mass Transportation Operations, 53 Fed.Reg. 47,156, 47,174 (Nov. 21, 1988) (to be codified at 49 C.F.R. § 653).

2. Before the district court, appellants argued that UMTA's drugtesting regulations pertaining to random drug testing violated the fourth amendment's proscription against unreasonable searches and seizures. While the case was pending in district court, this court issued *American Federation of Government Employees v. Skinner,* 885 F.2d 884 (D.C.Cir.1989), *National Federation of Federal Employees v. Cheney,* 884

F.2d 603 (D.C.Cir.1989) *petition for cert. filed,* 58 U.S.L.W. 3361 (U.S. Oct. 19, 1989) (No. 89–635), and *Harmon v. Thornburgh,* 878 F.2d 484 (D.C. Cir.1989) *petition for cert. filed sub nom. Bell v. Thornburgh,* 58 U.S.L.W. 3378 (Oct. 6, 1989) (No. 89–679), which appellants believe foreclosed both the district court and a panel of this court from finding the random drug-testing regulations violative of the fourth amendment. Appellants have preserved their constitutional challenge for possible rehearing *en banc,* or for review by the Supreme Court, but do not press it for purposes of this appeal.

Opinion ("Mem. Op.") at 4, Joint Appendix ("J.A.") at 70.

Where Congress prescribes the form in which an agency may exercise its authority, however, we cannot elevate the goals of an agency's action, however reasonable, over that prescribed form. In this case, we find that § 22 of the Act, the principal authority relied on by UMTA, sets out a specific protocol for federal intervention into local safety matters that does not include rulemaking on uniform, national criteria to be imposed on local transit authorities. *See* 49 U.S.C.App. § 1618. Contrary to the government's argument on appeal, we also find that the Unions have standing to pursue this action. Accordingly, we reverse with instructions to the district court to vacate the challenged regulations.

## I. BACKGROUND

### A. *Statutory Background*

The UMT Act provides for federal financial assistance to state and local agencies to assist in planning, establishing, and financing local mass transit systems. Pub.L. No. 88–365, 78 Stat. 302 (1964) (codified as amended at 49 U.S.C.App. §§ 1601–21). The Act is administered by UMTA, which operates under a delegation of authority from the Secretary of Transportation ("Secretary"). *See* 49 C.F.R. § 1.51 (1984). UMTA carries out its mandate by making grants or loans to state and local transportation agencies.

Much of UMTA's funding is distributed on a formula basis pursuant to the Act's § 9 and § 18 block grant programs. 49 U.S.C.App. §§ 1607a and 1614. Under the § 9 block grant program, for example, state and local agencies receive mass transportation funds based on a formula which takes into account the size of the urbanized areas, the amount of revenue, the number of bus revenue miles, and operating costs. 49 U.S.C.App. § 1607a(c). Under § 3 of the Act, 49 U.S.C.App. § 1602, UMTA is also authorized to make discretionary grants or loans to assist states and local agencies in financing, constructing, or improving mass transportation facilities and equipment, and introducing new technology or projects which enhance the effectiveness of mass transportation. 49 U.S.C.App. § 1602(a)(1).

Consistent with federal procurement practice, UMTA has the authority to impose terms and conditions on its awards as necessary to ensure successful completion of the project. Under its discretionary grant authority in § 3, for example, UMTA must determine that the fund recipients have the "legal, financial, and technical capacity" to carry out the purposes of the grants, *see* 49 U.S.C.App. § 1602(a)(2)(A)(i), and that the applicant has or will have "satisfactory continuing control" over the use of the facilities and the equipment, *see* 49 U.S.C.App. § 1602(a)(2)(A)(ii). Under its formula grant program, applicants must merely certify to UMTA that they meet these conditions. *See* 49 U.S.C.App. §§ 1607a(e)(3)(A) and (e)(3)(B). Additionally, in accordance with the provisions of the Act, UMTA can prescribe "terms and conditions" for its discretionary grants and loans, *see* 49 U.S.C.App. § 1602(a)(1), and for its formula grant program for areas other than urbanized areas (as long as those "terms and conditions" are appropriate to the special needs of public transportation in nonurban areas), *see* 49 U.S.C. App. § 1641(f).

In its notice of proposed rulemaking, UMTA suggested that this grant-conditioning language provided it with statutory authority to promulgate safety regulations, such as the anti-drug program regulations at issue. *See* 53 Fed.Reg. at 25,913–914 and 53 Fed.Reg. at 47,169. It asserted that "technical capacity" must include the ability to provide safe mass transportation services, and that exercising "satisfactory continuing control" implies an ability to ensure the safe operation of UMTA-assisted facilities and equipment. 53 Fed.Reg. at 47,169. We do not find it necessary to determine the parameters of UMTA's authority to condition grants in this manner because Congress has delegated to UMTA specific authority over safety in § 22 of the Act, 49 U.S.C.App. § 1618.

Section 22 states in full:

The Secretary may investigate conditions in any facility, equipment, or manner of operation financed under this chapter which the Secretary believes creates a serious hazard of death or injury. The investigation should determine the nature and extent of such conditions and the means which might best be employed to correct or eliminate them. If the Secretary determines that such conditions do create such a hazard, he shall require the local public body which has received funds under this chapter to submit a plan for correcting or eliminating such condition. The Secretary may withhold further financial assistance under this chapter from the local public body until he approves such plan and the local public body implements such plan.

49 U.S.C.App. § 1618. As UMTA acknowledged in its brief and at oral argument, and as is apparent from the statutory scheme, this section clearly governs UMTA's authority over safety matters. And, contrary to the Unions' claim, UMTA did refer to its "role in transit safety" as expressed by Congress in § 22 of the Act as providing the "statutory basis" for the regulations in both its notice of proposed rulemaking and in its final rule. *See* 53 Fed.Reg. at 25,914 ("Section 22 of the UMT Act provides the Secretary ... with authority to investigate certain conditions which the Secretary believes create a serious hazard of death or injury. If the Secretary determines that such conditions do create such a hazard, the Secretary shall require the recipient of UMTA funding to submit a plan for correcting or eliminating such condition."); 53 Fed.Reg. at 47,169 ("In addition, Congress has indicated its policy that UMTA have a continuing role in transit safety in section 22 of the UMT Act."). We, therefore, base our analysis of the scope of UMTA's safety authority on an assessment of § 22 on its own terms and as it fits into UMTA's statutory scheme. With § 22 as the backdrop, then, we will now describe the anti-drug program as set out in the challenged regulations.

### B. *UMTA's Regulations*

Based on the premise that the use of any controlled substance has the potential to degrade safety performance, UMTA proposed regulations that would detect and deter drug use among mass transportation workers performing sensitive-safety functions.[3] Notice of Proposed Rulemaking, Control of Drug Use in Mass Transportation Operations, 53 Fed.Reg. at 25,910 (July 8, 1988). On December 21, 1988, after receiving over 170 comments and holding hearings on the proposed rule, UMTA issued its final rule. 53 Fed.Reg. at 47,156.

Pursuant to the regulations, recipients of funds under §§ 3, 9, or 18 of the Act must certify to UMTA that they have established and implemented an anti-drug program with numerous mandatory features.[4] Recipients must develop a policy statement regarding drug use in the workplace. They must also develop employee education and training programs for all employees who perform sensitive-safety functions, and display and distribute information about drug use and abuse. Supervisors must receive at least 60 minutes additional training on these issues.

Most significantly, the program must provide for drug testing in five situations: (1) pre-employment testing of an individual selected for a sensitive-safety position; (2) post-accident testing where death, injury requiring medical attention, or $5,000 property damage has occurred; (3) reasonable cause testing triggered by circumstances articulated and substantiated by specific

---

**3.** UMTA defines "sensitive safety functions" in the following manner:

(i) [A]ny duty related to the safe operation of mass transportation service by a recipient, including: (1) Operation of a revenue service vehicle, whether or not such vehicle is in revenue service; (2) Controlling dispatch or movement of a revenue service vehicle; (3) Maintaining revenue service vehicles or equipment used in revenue service; or (4)

Supervising an employee who performs a function listed in paragraph (i)(1)–(3) of this section.

53 Fed.Reg. at 47,174.

**4.** The final rule also applies to recipients of funds under 23 U.S.C. § 103(e)(4) and to "any public or private operator providing mass transportation services for the recipient with [UMT Act] funds." 53 Fed.Reg. at 47,157.

contemporaneous physical indicators of probable drug use; (4) random, unannounced testing; and (5) return-to-duty testing for anyone who failed a post-accident, reasonable cause, or random drug test. The drug testing program must comply with the Department of Health and Human Services ("HHS") "Mandatory Guidelines for Federal Workplace Drug Testing Programs," 53 Fed.Reg. 11,970 (1988), as they have been adapted and modified by the Department of Transportation ("DOT") to take into account differences between federal agencies (which are governed by the HHS guidelines), and DOT-regulated industries. *See* Final Rule, Procedures for Transportation Workplace Drug Testing Programs, 54 Fed.Reg. 49,-854 (1989) (to be codified at 49 C.F.R. Part 40).

Before reviewing the validity of these regulations, we will address the government's claim that appellants lack standing to bring this action because they fall outside the zone of interest of the relevant statute.

## II. PRUDENTIAL STANDING

That appellants have a sufficiently personal stake in the outcome of this case to satisfy Article III standing requirements is not in doubt. *See Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975); *see also National Treasury Employees Union v. Von Raab*, 649 F.Supp. 380, 383–84 (E.D.La.1986), *aff'd in part, vacated in part on other grounds,* —— U.S. ——, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (union had standing based on individual union members' standing to challenge drug testing program); *Committee for GI Rights v. Callaway*, 518 F.2d 466, 471–72 (D.C.Cir.1975) (members of plaintiff class subject to Army's drug testing program had requisite personal stake in outcome to confer constitutional standing). For the first time on appeal, the government claims that the Unions do not satisfy prudential standing requirements. We find their argument unpersuasive.

■ Prudential standing requires that the appellants' complaint fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). The relevant inquiry is whether the appellants' "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Industry Association*, 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987).

■ The statutory question framed in this case is whether UMTA had sufficient authority to impose drug testing requirements on local transit authorities. From that, the government claims that since "Congress was not addressing the interests of employees when it made the critical decisions allocating authority between the federal and local agencies," the Unions and employees are not within the zone of interest of the statutory authority underlying these regulations. Brief for Appellees at 46. UMTA insists that appellants' position resembles more that of the plaintiffs who failed the zone of interest test in *National Federation of Federal Employees ("NFFE") v. Cheney*, 883 F.2d 1038 (D.C. Cir.1989), and in *Hazardous Waste Treatment Council v. Environmental Protection Agency*, 861 F.2d 277 (D.C.Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989) (*"HWTC II "*) than plaintiffs whose interests have been found to fall squarely within the zone of interest of the relevant statutes. *See, e.g., American Postal Workers Union v. United States Postal Service*, 891 F.2d 304 (1989) (postal employees' interests found to be largely congruent with Congress' intent to preserve postal monopoly); *Clarke v. Securities Industries Association*, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987); *Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1969). We disagree.

In *NFFE v. Cheney,* government employees complained that the Department of Defense's decision to contract work outside of

the government would cause an adverse impact to in-house employees. The court found appellants' interests to be outside the zone of interest because the governmental efficiency purposes behind the 1921 Budgeting and Accounting Act were "fundamentally inconsistent with the interests asserted by appellants." *NFFE v. Cheney*, 883 F.2d at 1047. From that, UMTA concludes that since the Unions' interests here may not always converge with the local transit authorities' interest under the Act, they too fall outside its zone of interest.

The government is clearly mistaken. Contrary to the government's position, the Unions' interest in the proper balance between federal and local control is at least as congruent with the intent and structure of the UMT Act as that of the local transit authorities; indeed, the Unions may be more concerned about preserving local control to maintain hard-won local collective bargaining rights. As the rulemaking record itself demonstrates, existing local programs that pre-date the UMTA regulations have drug testing procedures in place that are governed by labor agreements. *See* 53 Fed.Reg. at 47,156–157. Any attempt by the federal government to impose additional requirements on local transit authorities directly implicates the balance of negotiating power already established in each locale. In this sense, the employees' interests cannot be described as directly "inconsistent" with the interests Congress intended to protect in crafting lines of authority between this federal grant-in-aid agency and the local operating authorities.

Nor does the result in *HWTC II* provide greater support for the government's contentions. In that case, a national trade organization of firms engaged in the treatment of hazardous waste and the manufacture of equipment for that purpose challenged the Environmental Protection Agency's ("EPA") regulations on the basis that they were not comprehensive and vigorous enough to comply with the controlling statute. The court found that Congress' "indisputable intent" to encourage proper disposal and recycling of hazardous wastes did not show that Congress either intended to benefit recycling and disposal firms nor

that such firms' interests were more than "marginally related" to Congress' environmental purposes. *HWTC II*, 861 F.2d at 283. In other words, the Council's interests coincided only "accidentally" with the statute's goals, and, thus, fell outside its zone of interest.

The Unions' interest in this case in preserving local authority over safety matters is much more integrally related to Congress' scheme in the UMT Act than was true in *HWTC II*. First, UMTA itself, in the rulemaking, recognized that one purpose of imposing uniform rules on local authorities was to ensure that the "privacy and reliability concerns of employees" were properly balanced against the safety concerns of mass transit passengers, suggesting that employee concerns are imbedded in § 22 itself. 53 Fed.Reg. at 47,173. Second, as *Clarke* and *American Postal Workers* make clear, we are not limited to considering the one statutory provision which is primarily at issue, here § 22 of the UMT Act; instead, we may consider any provision that helps us to understand Congress' overall purposes in the statutory scheme. *See, e.g., Clarke*, 479 U.S. at 401, 107 S.Ct. at 758; *American Postal Workers*, at 309 ("An examination of the function of the [Postal Express Statutes] in advancing the goals of the entire [Postal Reorganization Act ("PRA")] demonstrates the relevance of the PRA to our zone of interests inquiry."); *see also Wilderness Society v. Griles*, 824 F.2d 4, 18 n. 11 (D.C.Cir.1987) ("Thus, plaintiffs ... appear to fall within the zone of interests of the statutory scheme represented by the three complementary enactments.").

In this case, we find congressional solicitude throughout the statutory scheme for preserving employees' collective bargaining rights at the local level. *See, e.g.,* 49 U.S.C.App. § 1601(b)(3) ("The purposes of this chapter are—to provide assistance to State and local governments and their instrumentalities in financing such systems to be operated by public or private mass transportation companies as determined by local needs."); 49 U.S.C.App. § 1608(d) ("None of the provisions of this chapter shall be

construed to authorize the Secretary to regulate in any manner the mode of operation of any mass transportation system with respect to [discretionary grants]."); 49 U.S.C.App. § 1609 (provision ensuring that fair and equitable arrangements have been made to protect the interest of employees affected by the federal assistance).

Rather than reflecting interests outside the zones of interest as in *NFFE v. Cheney* and *HWTC II*, then, the Unions' interests in this case fall squarely within the zone of interest of the UMT Act. We, therefore, conclude that appellants easily satisfy the prudential zone of interest test.

## III. ANALYSIS

### A. *Standard of Review*

■ An agency's "power to promulgate legislative regulations is limited to the authority delegated" to it by Congress. *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988). In reviewing an agency's interpretation of its statutory authority, we must employ traditional tools of statutory construction to determine whether Congress had "an intention on the precise question at issue." *Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781 n. 9, 81 L.Ed.2d 694 (1984). To ascertain the intent of Congress, we look to "the particular statutory language at issue, as well as the language and design of the statute as a whole," *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988), and, where appropriate, legislative history. *Ohio v. United States Department of the Interior*, 880 F.2d 432, 441 (D.C.Cir.1989). If we find that Congress has clearly spoken on the issue in question, then "that intention is the law and must be given effect." *Chevron*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2781 n. 9 ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."); *see, e.g., Amalgamated Transit Union, AFL–CIO v. Brock*, 809 F.2d 909 (D.C.Cir.1987) (under *Chevron*, Secretary exceeded his statutory authority because the language and legislative history of the UMT Act precluded him from certifying labor protective provisions under § 13(c) before a provision for a dispute mechanism was in place).

In this case, the precise question at issue is whether Congress intended § 22 to permit UMTA to address mass transit safety hazards by imposing a uniform national solution on local transit authorities by prophylactic rulemaking. The Unions argue that § 22 affirmatively prohibits UMTA from issuing the challenged drug testing regulations. UMTA counters that nothing in the statutory language of the Act nor its history precludes it from promulgating broad safety regulations since neither indicates that Congress focused on the safety hazard caused by illegal drug use. UMTA would have us move to step two of the *Chevron* analysis, under which we must defer to its interpretation of the statute so long as it is reasonable and consistent with the statutory purpose. *Chevron*, 467 U.S. at 844–45, 104 S.Ct. at 2782–83.

We agree with the Unions' analysis. It is not necessary to proceed to step two of *Chevron* to resolve this case because a close reading of the language and structure of the Act, and its legislative history, reveals that Congress did not grant UMTA the statutory authority to promulgate general safety regulations. We now proceed to that analysis.

### B. *The Scope of UMTA's Authority Over Safety*

#### 1. Statutory Language

■ Turning first to the language of the statute itself, we note that Congress gave UMTA carefully circumscribed authority to deal with safety hazards in § 22. The statute permits UMTA to "investigate conditions in any facility, equipment, or manner of operation financed" with UMT Act funds which it believes create a "serious hazard of death or injury." The investigation should determine the nature and extent of such conditions, and "the means which might best be employed to correct or eliminate them." Once this investigation is

completed, however, the statute explicitly leaves to the "local public body which has received funds" the responsibility for drafting a plan to eliminate or correct any identified safety hazard. UMTA can thus require from the local transit authority a plan to deal with the safety problems. This language does not, however, confer authority upon UMTA to define initially through rulemaking the precise terms of that plan and condition receipt of federal money on compliance with those specific terms, prior to any dialogue with local agencies (and their unions) that must begin by the submission of a locally-developed plan.

To be sure, UMTA is not completely without authority in working to correct the safety hazard. First, Congress stated that UMTA's investigation "should" determine the "means which might best be employed to correct or eliminate" the hazardous conditions. Second, the last sentence of § 22 allows UMTA to withhold "further financial assistance" from the local public body until it "approves *such* plan" (emphasis added), and the local public body implements *such* plan. But, "such plan" refers back specifically to the plan which must first be submitted by the local public body, not to a plan that UMTA determined to be the "best" through prophylactic rulemaking that did not give the local bodies (nor the unions) an opportunity to express their views in submitted plans as to how to solve discrete, local problems. We fail to see how any other reading of UMTA's approval authority is possible.

UMTA contends that since an agency, in general, has discretion to choose between rulemaking and case-by-case adjudication, and since it could decide not to approve any

"such plan" that did not include random drug testing, for example, then this court must uphold its regulations if reasonable. We do not need to reach the question of the scope of UMTA's authority to approve individual plans. We agree with the Unions that this characterization of the issue begs the question whether UMTA can proceed via rulemaking to impose uniform, national rules on state and local transit authorities under the authority specifically delegated to it under § 22. We conclude that it cannot. When Congress gave UMTA authority to investigate safety hazards, it did so in a manner that requires case-by-case development of local solutions to those hazards. The dialogue between UMTA and its grantees to solve those safety hazards was carefully designed to take place in a manner which requires UMTA to react to local plans for dealing with local manifestations of a safety problem, even if that problem is experienced in many mass transit systems. It was not designed to proceed via national, impersonal rulemaking procedures which produced a federally-mandated solution that might or might not be responsive to concerns at the local level.[5]

Our reading of Congress' intent with respect to UMTA's authority over safety matters is given additional support in the legislative history of § 22. The original 1964 Act did not give UMTA any authority over safety matters. In 1974, Congress enacted the safety hazard provision (originally, 49 U.S.C. § 1604a), because the Department of Transportation had refused to investigate mass transit accidents that had recently occurred. *See* 119 Cong. Rec. at 32,819–820 (1973).[6] The sponsors' statements do not suggest that Congress sought

---

5. UMTA also attempts to justify its regulations by claiming that "[t]he local transit authorities also have discretion in designing anti-drug programs in a manner that suits their operation, as long as the program contains *all of the elements required by the UMTA regulations.*" Brief for Appellee at 36 (emphasis added). Local transit authorities, for example, can decide whether to provide rehabilitation programs for their employees or whether to test for alcohol as well as drug use. That the local transit authorities could decide to include other features in its otherwise mandatory anti-drug program, however, does not alter the prescriptive nature of

UMTA's regulations, nor does it alter our review of them.

6. Since the safety section was proposed originally as a floor amendment, its legislative history is limited to sponsors' statements on the floor. *See* 119 Cong. Rec. at 32,819–820 (1973). Those statements, then, should be viewed as "authoritative indications of congressional intent." *National Security Archive v. U.S. Dept. of Defense,* 880 F.2d 1381, 1385 (D.C.Cir.1989), citing *North Haven Board of Education v. Bell,* 456 U.S. 512, 527, 102 S.Ct. 1912, 1921, 72 L.Ed.2d 299 (1982).

to impose uniform national safety requirements on the grant recipients themselves. Indeed, Congresswoman Holtzman tried unsuccessfully to garner support for a provision that would have required safety planning as a condition of receiving funds. 119 Cong. Rec. at 32,819 ("My colleagues and I initially intended to require planning for safety as a condition for obtaining operating subsidies. Unfortunately, because section 2 of the act dealing with planning was stricken, we were prevented from improving the act in that regard.").

In our view, when the federal government designs and mandates a uniform national plan that is not in any respect tailored to local needs and circumstances, such a result cannot be squared with the express terms of § 22 nor with its legislative history, through which Congress gave the local transit authorities, not UMTA, the responsibility of responding to UMTA's identification of a safety hazard by submitting a locally-designed safety plan.[7]

### 2. Structure of the Act

Congress' carefully chosen design for allocating safety responsibility in § 22 should not be interpreted to confer any broader safety authority upon UMTA than is expressly provided, given the federalism values which permeate the entire structure of the UMT Act. These values are evident throughout the "Findings and purposes" sections of the Act, where Congress described the purposes of the Act in the following terms:

(1) to assist in the development of improved mass transportation ..., *with the cooperation of* mass transportation companies both public and private;

(2) to encourage the planning and establishment of areawide urban mass transportation systems ..., *with the coopera-*

*tion of* mass transportation companies both public and private; and

(3) to provide assistance to State and local governments and their instrumentalities in financing such systems, *to be operated by public or private mass transportation companies as determined by local needs.*

49 U.S.C.App. § 1601(b) (emphasis added). While Congress clearly had "efficient, safe, and convenient transportation" as one of its goals, it sought to achieve that goal by creating "a partnership which permits the local community, through Federal financial assistance, to exercise the initiative necessary to satisfy its urban mass transportation requirements." 49 U.S.C.App. § 1601a; *see also* H.R.Rep. No. 204, 88th Cong., 2d Sess. 5 (1964), *reprinted in* U.S. Code Cong & Ad.News 2569, 2573 ("[T]he leadership and financial assistance of the Federal Government is needed now to encourage solutions that are generally applicable to urban areas regardless of size, and for which those areas themselves will have the primary choice and responsibility.").

This concern for federalism values, expressed throughout the passage of the original bill, became the driving force behind the 1982 amendments. H.R.Rep. No. 555, 97th Cong., 2d Sess. 37 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 3639. In the Surface Transportation Assistance Act of 1982, Congress substantially revised UMTA's grant program to make its concerns about local transit authority autonomy even more explicit than they had been in prior versions of the Act. The 1982 Act shifted a substantial portion of UMTA's grant money to block grants, which would be distributed on a formula basis to states for their mass transit needs. *See* 49 U.S.C.App. § 1607a. It provided

---

**7.** In apparent keeping with the federalism theme of the 1982 reenactment of UMTA, discussed in more detail below, the Reagan Administration originally proposed to eliminate § 22 altogether in the 1982 Act. *See* S. 2367, § 16, *reprinted in Transit Assistance Act of 1982: Hearings on S. 2367 and S. 2377 Before the Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking, Housing, and Urban Affairs,* 97th Cong., 2d Sess. 27 (1982). Never-

theless, Congress decided to preserve UMTA's limited authority to address safety hazards in § 22, although in keeping with the enhanced focus on federalism values, Congress changed the language so as to make the Secretary's decision to investigate a safety hazard discretionary, rather than mandatory as it had been originally. *See* 49 U.S.C.App. § 1618 ("The Secretary may investigate ...").

increased flexibility enabling state and local officials to devise their own transportation programs to meet their unique, local needs. Block grant recipients need only present UMTA with a certification that they have complied with the terms and conditions of the grant.[8] Through such restructuring, Congress intended to turn much of the control still exercised at the federal level over to state and local governments. H.R.Rep. No. 555 at 37, *reprinted in* 1982 U.S.Code Cong. & Ad.News at 3675.

In contrast to the manner in which Congress designed § 22, in those areas where Congress did delegate authority to UMTA to prescribe regulations for local transit authorities, it did so explicitly. In § 1604(d)(2), for example, Congress required the Secretary to issue regulations as necessary to administer grants for the acquisition, construction, improvement, or operation of mass transit projects. Pursuant to that authority, UMTA adopted regulations setting out uniform technical specifications and certain other contractual provisions to be used by local governments in purchasing advanced design busses with UMTA grant funds, *see* 42 Fed.Reg. at 13,816 (1977), although mandatory use of these specifications has since been rescinded, *see* 47 Fed.Reg. at 44,457 (1982). *See also* 49 U.S.C.App. § 1607(d) (requiring that grants or contracts awarded for long-range planning be made "in accordance with criteria *established by* the Secretary") (emphasis added).

Similarly, in § 1612(d), Congress explicitly provided for rulemaking procedures for the purpose of implementing § 1612, requiring that recipients of mass transit funds provide special assistance to elderly and handicapped persons. 49 U.S.C.App. § 1612(d). That subsection mandates that UMTA adopt regulations that would establish minimum criteria for the provision of those services. *See Americans Disabled for Accessible Public Transportation (ADAPT) v. Skinner*, 881 F.2d 1184 (3d Cir.1989) (detailing the somewhat tortuous

history of the Department of Transportation's efforts to comply with § 1612, and concluding that when Congress enacted § 1612(d) in 1982, it sought to require a more active federal role in the development and enforcement of substantive standards for serving the handicapped in federally-assisted mass transit programs). Clearly, had Congress wished UMTA to play a similarly active role in mass transportation safety, it would have expressed that desire in the same manner when amending § 22 in the 1982 Act. It did not do so.

UMTA argues that evidence that Congress granted it rulemaking authority in these and other provisions of the Act supports its contention that it can act via rulemaking when it comes to safety matters. We agree with the Unions that the argument cuts the other way. As we have shown, on the few occasions when Congress intended to give UMTA broad rulemaking authority, *vis-a-vis* its grantees, it did so expressly. Unless and until Congress chooses to confer such authority to UMTA over safety matters, UMTA's uniform, national anti-drug program regulations do not represent a valid exercise of its statutory authority.

## IV. Conclusion

In assessing the federalism implications of its proposed rule, UMTA explained that:

Historically, transportation safety in the mass transit industry has not been the subject of specific UMTA regulatory requirements. Unlike other DOT organizations (*e.g.*, [Federal Aviation Administration], [Federal Highway Administration], Coast Guard, [Federal Railroad Administration]), UMTA has never directly licensed or regulated industry employees for safety. These matters have been handled locally by transit authorities.

53 Fed.Reg. at 25,920. We believe that Congress intended for such matters to continue to be handled locally, with UMTA's guiding hand, not with an iron fist.

**8.** The district court itself recognized Congress' concern for local autonomy in the 1982 Act when it concluded that UMTA's "powers to use the leverage of its grants were substantially eviscerated in the name of federalism by the [1982 Act]." Mem. Op. at 4, J.A. at 70.

Admittedly, UMTA's drug testing program is similar to the drug testing program implemented by the DOT for its own safety-related employees, which this court recently upheld as constitutional. *See American Federation of Government Employees v. Skinner*, 885 F.2d 884 (D.C. Cir.1989). It is also strikingly similar to anti-drug program rules published by DOT's other operating agencies, including the Federal Aviation Administration ("FAA"), the Federal Highway Administration ("FHWA"), and the Federal Railroad Administration ("FRA"). *See, e.g.*, FAA, Anti-Drug Program for Personnel Engaged in Specific Aviation Activities, 53 Fed.Reg. 47,024 (1988) (to be codified at 14 C.F.R. pts. 61, 63, 65, 121, and 135); FHWA, Controlled Substance Testing, 54 Fed.Reg. 53,294 (1989) (to be codified at 49 C.F.R. pt. 391); FRA, Random Drug Testing: Amendments to Alcohol/Drug Regulations, 53 Fed.Reg. 47,102 (1988) (to be codified at 49 C.F.R. pts. 217 and 219). Indeed, as the district court noted, the "form and language of the [UMTA] criteria seem to have been inartfully copied from regulations issued by Department of Transportation agencies which have direct regulatory authority, not possessed by [UMTA]." Mem. Op. at 4, J.A. at 70.[9]

But, therein lies the fatal flaw in UMTA's rulemaking: Congress has chosen not to give UMTA direct regulatory authority over urban mass transit safety to the extent that would justify imposing a mandatory drug testing program on the employees of state, local, and private operating authorities. We hold accordingly that UMTA exceeded its statutory authority over safety matters by imposing through rulemaking uniform, national requirements on local transit authorities. We reverse

with instruction to the district court to vacate the anti-drug program rule.

*It is so ordered.*

---

9. The Federal Railroad Safety Act of 1970, for example, authorizes the Secretary of Transportation to "prescribe, as necessary, appropriate rules, regulations, orders, and standards for all areas of railroad safety." 45 U.S.C. § 431(a). Pursuant to that authority, the FRA promulgated regulations that mandate blood and urine tests of employees involved in certain train accidents. *See Skinner v. Railway Labor Executives Ass'n*, ____ U.S. ____, 109 S.Ct. 1402, 103 L.Ed.2d

639 (1989) (post-accident drug and alcohol testing held constitutional). Similarly, the Motor Carrier Safety Act of 1984 requires the Secretary of Transportation to issue regulations "establish[ing] minimum Federal safety standards for commercial motor vehicles" to guarantee the safe maintenance of the vehicles and to ensure that the drivers' physical condition "is adequate to enable them to operate such vehicles safely." 49 U.S.C.App. § 2505(a).