Anthony V. WINTERS, Appellant,

v.

Walter RIDLEY, Director,

District of Columbia Department of Corrections, Appellee,

United States of America, Intervenor–Appellee.

No. 90–18.

District of Columbia Court of Appeals.

Argued Dec. 19, 1990.
Decided Sept. 4, 1991.

Thomas J. Mikula, with whom Stephen J. Pollak, Washington, D.C., was on the brief, for appellant.

Mary L. Wilson, Asst. Corp. Counsel, with whom Herbert O. Reid, Sr., Corp. Counsel at time brief was filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellee.

Stevan Bunnell, Asst. U.S. Atty., Washington, D.C., for intervenor-appellee.

Before FERREN and SCHWELB, Associate Judges, and MACK, Senior Judge.

PER CURIAM.

The judgment of the trial court is affirmed.

SCHWELB, Associate Judge, concurring:

Winters appeals from an order of the trial court denying his petition for a writ of habeas corpus. He contended below, and continues to maintain on appeal, that by declining to credit him with "good time," the District of Columbia Department of Corrections (DOC) has unlawfully prolonged the term that he must serve pursuant to his "mandatory minimum" sentence for first degree murder.[1] A majority of the division votes to affirm. I concur and state my reasons for doing so in this opinion. Judge Ferren concurs separately. Judge Mack dissents.

I

THE LEGISLATION

This case involves the interplay between the District of Columbia's first degree murder statute, which was designed to ensure that those convicted of premeditated murder be adequately punished for their crimes, and its "good time credit" legislation, which was intended to relieve prison overcrowding, to encourage prisoners to rehabilitate themselves, and, implicitly, to temper justice with mercy in those cases in which such tempering is appropriate.[2]

1. Habeas corpus is the appropriate remedy. *See Chatman-Bey v. Thornburgh,* 274 U.S.App.D.C. 398, 404 n. 5, 864 F.2d 804, 810 n. 5 (1987).

2. At least two members of the Council invoked biblical principles in this regard. In the words of Mrs. Wilhelmina Rolark, who chaired the Judiciary Committee, the GTCA has, I think a laudable purpose which is to address the prison situation. I know that there has been misbehavior. There have been violations of our laws, but after all it is part of the Christian ethic that a man or a woman can reform.

Mrs. Nadine Winter, however, expressed "deep concerns" about reducing the minimum sen-

On or about December 6, 1977, following a jury trial, Winters was convicted of murder in the first degree and of robbery. In conformity with the "mandatory minimum" provisions of D.C.Code § 22–2404(b), he was sentenced to imprisonment for a term of twenty years to life on the murder count. He received a concurrent sentence of five to fifteen years for robbery. He remains incarcerated pursuant to his sentence for murder.

The statute under which Winters was sentenced provides that persons convicted of murder in the first degree must serve at least twenty years in prison without parole. It reads as follows:

§ 22–2404 Penalty for murder in first and second degrees.

(a) The punishment of murder in the first degree shall be life imprisonment.

(b) Notwithstanding any other provision of law, a person convicted of first-degree murder and upon whom a sentence of life imprisonment is imposed shall be eligible for parole only after the expiration of 20 years from the date he commences to serve his sentence.

(c) Whoever is guilty of murder in the second degree shall be imprisoned for life or not less than 20 years.

The District of Columbia Good Time Credits Act of 1986 (GTCA), D.C.Code § 24–428 *et seq.* (1989) became effective on April 11, 1987. Section 24–428(a) provides in pertinent part that

[e]very person who is convicted of a violation of a District of Columbia ("District") criminal law by a court in the District of Columbia, imprisoned in a District correctional facility, and whose conduct is in conformity with all applicable institutional rules is entitled to institutional good time credits in accordance with the provisions of this section.

Prior to the enactment of the GTCA, good time credit was allowed only against the *maximum* sentence, and the prisoner was required to serve his entire minimum sen-

tence. *See Solomon v. United States,* 569 A.2d 1185, 1186 (D.C.1990). The GTCA liberalized the law by allowing good time credit to reduce a defendant's *minimum* sentence. *Id.* A defendant serving a sentence of ten years or more may earn ten days good time credit for each month of his sentence. D.C.Code § 24–428(a)(5).

The GTCA tempers mercy with justice, and contains certain explicit exceptions from the benefits which it confers. Section 24–434 states that

[i]nstitutional and educational good time credits shall not be applied to the minimum terms of persons sentenced under the District of Columbia Mandatory–Minimum Sentences Initiative of 1981, effective March 9, 1982 (D.C. Law 4–166, §§ 22–3202, 33–501 and 33–541).

In the 1981 initiative to which § 24–434 alludes, the voters of this jurisdiction adopted mandatory minimum sentences for persons convicted of certain armed crimes, D.C.Code § 22–3202 (1989), or of distribution of controlled substances and related offenses, D.C.Code § 33–541 (1988). *See generally Lemon v. United States,* 564 A.2d 1368, 1379 (D.C.1989).

Persons imprisoned in the District of Columbia are placed in the custody of the District's Department of Corrections (DOC), which administers the sentence imposed by the court. In May 1987, one month after the effective date of the GTCA, the Director of the DOC issued a departmental order specifying that the Act does not apply to inmates serving twenty-year mandatory minimum sentences for first degree murder pursuant to § 22–2404(b). *See* DOC Order No. 4340.2, at para. 10 (1987). Several months later, the Director adopted formal rules to the same effect. 35 D.C.Reg. 1077 (February 9, 1988). The effect of the order and of the subsequent rules was that defendants convicted of first degree murder would continue to serve the full twenty-year minimum

tence when "a little old lady ... has been robbed or beaten."

I *agree* wholeheartedly, it's a part of the Christian ethics. But I also use the Old Testament.

Her reference was, presumably, to the notion of an "eye for an eye" or "tooth for a tooth." *See Exodus* 21:24.

term without parole, notwithstanding the enactment of the GTCA.

On May 15, 1989, however, Honorable Joyce Hens Green held in *Cunningham v. Williams*, 711 F.Supp. 644 (D.D.C.1989), *app. pending* Nos. 89–1571, 89–5203 (U.S.App.D.C.), that a prisoner who had been convicted of first degree murder was entitled to receive the benefits of the GTCA. Rejecting the District's contention that the phrase "notwithstanding any other provision of law" in § 22–2404(b), when coupled with the policy disfavoring repeals by implication, supported the DOC's construction of the Act, Judge Green wrote that

> the natural meaning of the phrase notwithstanding any other provision of law is law *existing* at the time § 22–2404(b) was passed. The Good Time Credits Act was passed subsequent to § 22–2404(b). Accepting the position urged by intervenor would mean that the Council could *never* modify former law. The Court refuses to endorse such a patently untenable position. Furthermore, as stated above, the D.C. Council spoke in no uncertain terms when it enacted the Good Time Credits Act. Had it desired to exclude § 22–2404(b) from the Act's reach, it clearly knew how to do so and it could have done so, but it did not do so. The Act's language is clear.

711 F.Supp. at 646 (emphasis in original).

The Council's reaction to Judge Green's decision was swift and emphatic. On May 30, 1989, fifteen days after the *Cunningham* opinion was issued, the Council unanimously passed the District of Columbia Good Time Credits Amendment Emergency Act of 1989, D.C. Act 8–41, which proscribed the application of the GTCA to persons convicted of first degree murder. The Council also passed the cumbersomely styled "Good Time Credits Amendment Act of 1989 Emergency Declaration Resolution of 1989," [3] the operative sections of which read as follows:

> Sec. 2. (a) There exists an immediate crisis regarding the application of good time credits to the minimum sentence of persons convicted for first degree murder.
>
> (b) On May 15, 1989, U.S. District Court Judge Joyce Hens Green rendered a decision in the case of *Eugene Jerome Cunningham v. Hallem H. Williams* [711 F.Supp. 644] (Civil Action No. 88–3732) in which she decided that the District of Columbia Good Time Credits Act of 1989, effective April 11, 1987 (D.C.Law 6–218; D.C.Code, sec. 24–428 *et seq.*) ("the Act"), must be applied to persons convicted of first degree murder under section 801 of An Act To establish a code of law for the District of Columbia, approved March 3, 1901 (31 Stat. 1321; D.C.Code, sec. 22–2404(b)) ("Criminal Code").
>
> (c) The application of the Act to persons convicted of first degree murder would reduce the minimum term for persons convicted after the effective date of the Act by approximately one third and reduce the minimum sentence of persons convicted before the effective date of the act to a period of less than 20 years.
>
> (d) The Council of the District of Columbia never intended the Act to apply to persons convicted for first degree murder.
>
> (e) The Council of the District of Columbia believed that the "notwithstanding any other provision of law" language of section 801 of the Criminal Code (D.C.Code, sec. 22–2404(b)) would exclude first degree murder from coverage of the Act as it applies to minimum sentences.
>
> (f) The enactment of the proposed emergency legislation will clarify the Council's intent with regard to first degree murder by specifically excluding that crime from the coverage of the Act as it applies to minimum sentences.
>
> Sec. 3. The Council of the District of Columbia determines that the circumstances enumerated in section 2 constitute emergency circumstances making it necessary that the District of Columbia Good Time Credits Emergency Amend-

---

**3.** Resolutions may be used, *inter alia*, "to express simple determinations, decisions, or directions of the Council of a special or temporary character." D.C.Code § 1–229 (1987).

ment Act of 1989 be adopted after a single reading.

Sec. 4. This resolution shall take effect immediately.

36 D.C.Reg. 4283–4284 (1989).

In order to assure that there would be no "gap" between the expiration of the Emergency Act and the enactment of permanent legislation, *see United States v. Alston*, 580 A.2d 587 (D.C.1990), the Council also enacted temporary legislation containing essentially the same language as the Emergency Act and excluding persons convicted of first degree murder from the benefits of the GTCA. 36 D.C.Reg. 4740 (1989). On July 11, 1989, the Council passed permanent legislation to the same effect.[4] 36 D.C.Reg. 5761 (1989). Following the required period of Congressional review, the amendment became effective on January 30, 1990.

The District concedes, as it must, that Winters' case is governed by the GTCA as it read prior to its amendment in 1989. It is not contended that the 1989 amendment may be applied to Winters retroactively. The District maintains, however, that the Council's actions in 1989 provide persuasive evidence of its intent in 1986, and that persons convicted of first degree murder were never intended to benefit from the GTCA. Although the question is not free from difficulty, I am constrained to agree.

## II

## DISCUSSION

In interpreting two statutes which somewhat paradoxically appear to be nudging it in opposite directions, the court must look first of all to their language. If the words are not dispositive, then we should examine the legislative history and the administrative construction of the Act. In the present case, we also have before us a declaration by the Council which was in office in 1989 as to the meaning of legisla-

tion enacted by a prior Council in 1986. Utilizing all of these clues as guideposts, I embark on the search for the holy grail of legislative intent.

### A. The Statutory Language.

As this court recently had occasion to observe in *Riggs National Bank v. District of Columbia*, 581 A.2d 1229, 1235 (D.C.1990),

"[i]n interpreting a statute, we are mindful of the maxim that we must look first to its language; if the words are clear and unambiguous, we must give effect to its plain meaning." *J. Parreco & Son v. District of Columbia Rental Hous. Comm'n*, 567 A.2d 43, 45 (D.C.1989) (citations omitted). "The words used [in the statute], even in their literal sense, are the primary, and ordinarily the most reliable, source of interpreting the meaning of any writing." *Id.* at 46 (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.) (per Learned Hand, J.), *aff'd*, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945)). Although "it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary," *Parreco, supra*, 567 A.2d at 46 (quoting *Cabell, supra*, 148 F.2d at 739), it is useful to have one around.

The "plain language" of the GTCA, when read in isolation, lends significant support to Winters' position. As Judge Green pointed out in *Cunningham, supra*, "the ordinary and natural reading of the D.C. Good Time Credits Act is that petitioner is entitled to institutional good time credits." 711 F.Supp. at 645. Section 24–428(a) provides that *"every* person who is convicted of a violation of District of Columbia law" is entitled to the benefits of the Act. Judge Green emphasized that the Council had specified certain exceptions to the reach of the statute but had not included persons convicted of first degree murder among the exceptions so enumerated. *Id.*

---

4. The permanent legislation provides in pertinent part that

[i]nstitutional and educational good time credits shall not be applied to the minimum terms of persons sentenced under the District

of Columbia Mandatory–Minimum Sentences Initiative of 1981 ... or section 4(b) of an Act ... approved July 8, 1932 (47 Stat. 650; D.C.Code sec. 22–3204(b)).

at 645–46. She concluded that the Council's enumeration of specific exceptions, coupled with its omission of any others,

> evinces a clear intent that the Act's provision for good time credits applies to every prisoner convicted and sentenced under a D.C. statute other than those specifically listed in D.C.Code § 24–434.

(Emphasis in original.)[5] *Accord, Andrus v. Glover Construction Co.*, 446 U.S. 608, 616–17, 100 S.Ct. 1905, 1910–11, 64 L.Ed.2d 548 (1980) ("where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied in the absence of a contrary legislative intent").

We are dealing here, however, with two enactments, rather than with one, and must also consider the language of the first degree murder statute. Section 22–2404(b) provides that a person convicted of first degree murder must receive a life sentence and serve at least twenty years without parole, *notwithstanding any other provision of law.* This is strong stuff. Judge Green thought that the italicized phrase applies only to a law which was in effect at the time § 22–2404(b) was enacted, and that any other construction would imply that the Council could never modify its past actions. *Cunningham, supra,* 711 F.Supp. at 646. Although the legislature cannot make any statute unrepealable, however, I think the language at issue here should be construed less restrictively than *Cunningham* suggests. As the court stated in *Illi-*

*nois National Guard v. Federal Labor Relations Authority,* 272 U.S.App.D.C. 187, 194, 854 F.2d 1396, 1403 (1988) (quoting *New Jersey National Guard v. Federal Labor Relations Authority,* 677 F.2d 276, 283 (3d Cir.1982)),

> [l]ooking first to the statutory language, we immediately confront the preface to section 709(e) of the Technician Act, which explicitly provides that its terms apply *"Notwithstanding any other provision of law ..."* [emphasis added]. A clearer statement is difficult to imagine; section 709(e) must be read to override any conflicting provision of law in existence at the time that the Technician Act was enacted. Application of this statement is less certain, however, with respect to a statute such as the Labor–Management Act, adopted *after* the Technician Act. The drafters of section 709(e) can hardly be said to have had the Labor–Management Act specifically within their contemplation. *Even so, the preemptive language is powerful evidence that Congress did not intend any other, more general, legislation, whenever enacted, to qualify the authority of the state adjutants general as set out in the Technician Act.* The language does not preclude a subsequent change of heart on the part of Congress, but it does suggest that any qualification of the terms of section 709(e) would be accepted by Congress only after some consideration of the factors requiring or permitting such a change.

---

5. Judge Green's analysis finds further support in the rule of lenity. "In case of doubt concerning the penalty prescribed by a statute, construction will favor a milder penalty over a harsher one." *Riggs, supra,* 581 A.2d at 1262 (quoting 3 N. Singer, Sutherland, Statutory Construction, § 59.-03, at 11 (4th ed. 1986) (hereinafter Sutherland)); *see also Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980); *Lemon, supra,* 564 A.2d at 1381. "This policy embodies the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should." *United States v. Bass,* 404 U.S. 336, 348, 92 S.Ct. 515, 522–23, 30 L.Ed.2d 488 (1971) (quoting H. Friendly, Mr. Justice Frankfurter and the Reading of Statutes, In Benchmarks 196, 209 (1967)). Mandatory minimum statutes restrict a judge's traditional sentencing discretion, and the application of the

rule of lenity is especially appropriate to resolve ambiguities in legislation of this kind. *See Dupree v. United States,* 583 A.2d 1000, 1004 n. 5 (D.C.1990), and the concurring opinion, *id.* at 1004–05 (D.C.1990); *see also United States v. Stokes,* 365 A.2d 615, 619 (D.C.1976) (applying rule of lenity and holding that youthful defendant convicted of first degree murder may be sentenced under former Federal Youth Corrections Act). To be sure, the rule of lenity is a secondary canon of construction, and is to be invoked only where the statutory language, structure, purpose and history leave the intent of the legislature in genuine doubt. *Lemon, supra,* 564 A.2d at 1381. The significance of the doctrine in this case, however, is that it tends to confirm the ordinary meaning of the language of one of the statutes under consideration.

(Emphasis added to next-to-last sentence). *See also* post at 581–584 (Ferren, J. concurring). I agree with this approach, and conclude that the insertion of the words "notwithstanding any other provision of law" means, at least, that any claim that a subsequent enactment was designed to reduce the mandatory minimum penalty for first degree murder must be analyzed with some caution before an intent to modify a well-entrenched policy may legitimately be inferred.

Repeals by implication are not favored. *Morton v. Mancari*, 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974); *Speyer v. Barry*, 588 A.2d 1147, 1164–66 (D.C.1991); *Simon v. Simon*, 58 App.D.C. 158, 159–60, 26 F.2d 530, 531–32 (1928). As Judge (now Justice) Scalia wrote for the court in *United States v. Hansen*, 249 U.S.App.D.C. 22, 26, 772 F.2d 940, 944 (1985),

> [i]t will not do to give this principle of statutory interpretation mere lip service and vacillating practical application. A steady adherence to it is important, primarily to facilitate not the task of judging but the task of legislating. It is one of the fundamental ground rules under which laws are framed. Without it, determining the effect of a bill upon the body of preexisting law would be inordinately difficult, and the legislative process would become distorted by a sort of blind gamesmanship, in which Members of Congress vote for or against a particular measure according to their varying estimations of whether its implications

will be held to suspend the effects of an earlier law that they favor or oppose. *See also Speyer, supra,* 588 A.2d at 1165 (quoting *Hansen* with approval).

Moreover, the GTCA deals with punishment for crimes generally, while § 22–2404(b) addresses the narrower and more specific subject of the penalty for first degree murder. "The force of [the doctrine that repeals by implication are not favored] is greater still when it is urged that a specific statute has been superseded by a later but more general one." *Illinois National Guard, supra,* 272 U.S.App.D.C. at 196, 854 F.2d at 1405.

Although the Council exempted certain mandatory minimum offenses from the reach of the GTCA, but did not include persons convicted of first degree murder in the exempted category, it did not expressly repeal the twenty-year mandatory minimum in § 22–2404(b). If the Council had explicitly addressed the language of the first degree murder statute and expressly stated that the mandatory minimum there established was no longer in effect, then we ought to have no hesitation in giving effect to such a declaration. It does not appear, however, that the Council wrestled with this particular question and, although the literal meaning of the GTCA is unquestionably helpful to Winters, it is not as conclusive as a specific allusion would have been. I am therefore of the opinion that if the two statutes are read side by side,[6] the Council's intent is not sufficiently clear to obviate the need for inquiry into other sources from which such intent can be discerned.[7]

---

6. In her dissenting opinion, Judge Mack refers to the "plain language" of the GTCA. In my view, however, the language of the two statutes, read together, is not at all plain.

7. The United States contended at argument, and the District also maintains, that it is unreasonable to ascribe to the 1986 Council the intention to allow good time for first degree murderers but not for armed offenders sentenced pursuant to the 1981 initiative. Since the mandatory minimum for a second armed offense is ten years with no parole and no good time, *see Lemon, supra,* 564 A.2d at 1379–81, and since as much as ten days per month can be subtracted from a prisoner's sentence under the GTCA, the two sovereigns suggest that the Council could

not have intended that defendants convicted of offenses so disparate in seriousness receive comparable periods of imprisonment.

Winters counters that the Council might well have been reluctant to override mandatory minimum sentencing provisions overwhelmingly ratified by the voters in the 1981 initiative, but less hesitant to reduce the punishment for first degree murder, which was fixed by the legislature, not by the electorate. Winters also correctly notes that several members of the Council emphasized that eligibility for good time credits would not automatically result in the early release of first degree murderers; the parole board is not *required* to grant parole as soon as a prisoner becomes eligible.

### B. The Legislative History.

The District and Winters both rely in some measure on the legislative history of the 1986 version of the GTCA to support their respective interpretations. In my judgment, however, that history is inconclusive.

The parties have not brought to our attention any discussion by the members of the Council of the precise issue here presented. My own examination has likewise uncovered none. Two of the members who supported the legislation, Mrs. Polly Shackleton and Mr. John Ray, apparently assumed that it would not affect mandatory minimum sentences, and they did not differentiate between those imposed under the 1981 sentencing initiative and those for first degree murder.[8] No member of the Council challenged the interpretation offered by Mrs. Shackleton and Mr. Ray.

Winters relies heavily on a lengthy letter to the Chairman of the Council from Joseph E. DiGenova, Esq., who was then United States Attorney for the District of Columbia, and who was strongly opposed to the passage of the bill. Mr. DiGenova claimed that the proposed legislation "would allow a person sentenced to a mandatory minimum, pursuant to several of the provisions of the District of Columbia Code, to be released before serving the required minimum simply by adhering to the rules of the institution." He argued specifically that first degree murder "was not exempt from the bill's good time provisions."

But "the fears and doubts of the opposition are no authoritative guide to the construction of legislation." *Shell Oil Co. v. Iowa Dept. of Revenue*, 488 U.S. 19, 29, 109 S.Ct. 278, 284, 102 L.Ed.2d 186 (1988) (citations and internal quotation marks omitted). The Supreme Court has often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably tend to overstate its reach. *N.L.R.B. v. Fruit & Vegetable Packers & Warehousemen, Local 760*, 377 U.S. 58, 66, 84 S.Ct. 1063, 1068, 12 L.Ed.2d 129 (1964). "An unsuccessful [opponent] cannot put words into the mouths of the majority and thus, indirectly, amend a bill." *Mastro Plastics Corp. v. N.L.R.B.*, 350 U.S. 270, 288, 76 S.Ct. 349, 361, 100 L.Ed. 309 (1956). "It is the sponsors that we look to when the meaning of the statutory words is in doubt." *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 394–95, 71 S.Ct. 745, 750–51, 95 L.Ed. 1035 (1951). In the present case, we have nothing definitive from the sponsors, and the remarks of Mrs. Shackleton and Mr. Ray tend, if anything, to support the District's position.

Winters also contends that a report by Kathryn R. Monaco, a corrections official from New Mexico who was appointed to advise the District's Department of Corrections as to how best to comply with court orders regarding conditions at its facilities, supports his construction of the GTCA. Ms. Monaco recommended that "good time" be credited to minimum sentences, and noted that while in the District a person convicted of first degree murder must serve twenty years without good time, a person convicted of that offense in Virginia receives life imprisonment, which usually amounts to fifteen years, and which may be reduced by "good time" to slightly more than ten years. Winters maintains that

---

Neither side's argument clearly refutes that of its adversary. Common sense does suggest that the Council might not have intended what Winters claims it intended, but the statutory text points, at least in some measure, in an opposite direction. This court has been reluctant "to invoke too readily the 'absurd result' doctrine, or related notions which are said to justify the disregard of statutory language," for a due respect for the principle of separation of powers counsels us not to substitute the judicial will for that of the legislature as expressed in that body's words. *Parreco, supra,* 567 A.2d at 46.

8. Defending the legislation against the contention that it would result in the release of dangerous criminals, Mrs. Shackleton stated that

[t]his is not mandatory to the Parole Board. It also does not affect mandatory sentences.

Mr. Ray concurred:

As Mrs. Shackleton pointed out, this law does not apply to the mandatory minimum sentencing. It impacts upon that in no way.

since the Monaco Report was presented to the Council, and since much of it was adopted, the Council must have intended to conform its law to that of Virginia in regard to first degree murder.

I am unable to agree with Winters' argument, however, because Virginia's statutory law is fundamentally different from the District's in critical respects. Virginia has a category of homicide known as capital murder, for which the penalty is death or imprisonment for life. Va.Code §§ 18.2–31, 18.2–10(a) (1990). First degree murder, the second most severe form of homicide, carries a penalty of imprisonment for life or for a period of no less than twenty years. *Id.* §§ 18.2–32, 18.2–10(b). One cannot fairly draw an analogy between the most serious homicides in the District and the second most serious ones in Virginia. Virginia defendants convicted of premeditated murder and sentenced to death obviously cannot receive credit for good time.[9]

*C. Administrative Construction.*

The District urges that in construing the GTCA, the court should give substantial weight to its administrative construction by the Department of Corrections. Almost immediately after the enactment of the statute, as I have noted, the Director of the DOC interpreted it as having no application to persons convicted of first degree murder. The Department subsequently issued formal rules to the same effect.

Courts accord great weight to any reasonable interpretation given to a statute by an agency charged with its administration or enforcement. *Winchester Van Buren Tenants Ass'n v. District of Columbia Rental Hous. Comm'n,* 550 A.2d 51, 55 (D.C.1988). This is particularly true where, as here, we have a "contemporaneous construction of a statute by the men [and women] charged with the responsibility of setting its machinery in motion and making the parts work efficiently and smoothly while they are yet untried and new." *Id.,* (quoting *Norwegian Nitrogen Co. v. United States,* 288 U.S. 294, 315, 53 S.Ct. 350, 358, 77 L.Ed. 796 (1933) (per Cardozo, J.)).

The District argues that deference is especially appropriate in this case. It says that the Council's failure to repeal or revise the GTCA in the face of its administrative construction constitutes persuasive evidence that this construction was the one which the Council intended. *See, e.g., Zemel v. Rusk,* 381 U.S. 1, 11, 85 S.Ct. 1271, 1278, 14 L.Ed.2d 179 (1965). Winters responds that there is no evidence that the Council was aware of the DOC's construction of the Act. "Legislative silence cannot mean ratification unless, as a minimum, the existence of the administrative practice is brought home to the legislature." *Thompson v. Clifford,* 132 U.S.App.D.C. 351, 361, 408 F.2d 154, 164 (1968). Nevertheless, there is a striking and arguably meaningful contrast between the Council's silence for more than two years in face of the administrative construction and the alacrity and vehemence with which that body reacted when confronted with Judge Green's contrary interpretation of the GTCA in *Cunningham.*[10] The force of the Council's expression of displeasure with the view that first degree murderers are entitled to good time suggests that even if the members of the Council did not know of DOC's interpretation, they would have been pleased with it if they had known.

DOC's order and rule, however, can only take us so far in this case. The issue before us is one of statutory construction, and the record contains no analysis by the Department of Corrections of the statutory

---

9. The parties have extracted several other nuggets from the legislative history and have attempted to turn them to their own advantage. We find none of the nuggets to be either golden or conclusive.

10. Citing *INS v. Cardoza Fonseca,* 480 U.S. 421, 446, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987) and *Amalgamated Transit Union v. Skinner,* 282 U.S.App.D.C. 322, 328, 894 F.2d 1362, 1368

(1990), Winters argues that the issue before us is a "pure" question of statutory construction and that deference to the DOC's interpretation is not warranted. This overstates the holdings in these cases. Both stand for the familiar proposition that the judiciary is the final authority on issues of statutory interpretation and that courts must reject an administrative construction which is contrary to the clear legislative intent.

language, nor is there any other indication of the agency's reasoning. The interplay between two different statutes enacted many years apart may not present the kind of problem in which administrative expertise is especially helpful. Moreover, there is no claim here that DOC officials helped to prepare or write the GTCA, and the weight accorded to an agency's construction is at its zenith "when the administrators participated in drafting and directly made known their views to [the legislature] in committee hearings." *Zuber v. Allen,* 396 U.S. 168, 192, 90 S.Ct. 314, 327–28, 24 L.Ed.2d 345 (1969). Finally, Winters has made a reasonably persuasive textual argument with respect to the GTCA, and this court has not hesitated to override an administrative interpretation which apparently runs afoul of statutory language. *See, e.g., Parreco, supra,* 567 A.2d at 48–49 and authorities there cited. All in all, we think that the administrative construction tilts in the District's favor, but not very much.

*D. The 1989 Legislation and Resolution.*

The District relies heavily on the Council's explicit declaration in 1989 with respect to what the GTCA of 1986 was intended to mean. The present case is somewhat unusual, in that the 1989 Council not only amended the statute, apparently for purposes of clarification, but also passed a resolution explaining exactly what the 1986 Council had on its mind. In Section 2(d) of the Emergency Declaration Resolution of 1989, the Council declared that the 1986 Council *"never intended the Act to apply to persons convicted of first degree murder."* In Section 2(e), the 1989 Council explained that the 1986 Council had believed that the "notwithstanding any other provision of law" language in § 22–2404(b) *"would exclude first degree murder from coverage of the Act as it applies to minimum sentences."*

Ten of the thirteen members of the 1986 Council, including the three who co-introduced the original GTCA—Chairman Clarke and Councilmembers Rolark and Mason—were members of the 1989 Council. The 1989 legislation and resolution passed unanimously. In the absence of evidence that the members of the Council were mistaken, or worse, about what they initially intended—and I emphasize that there is no such evidence—the 1989 legislation and resolution are surely revealing as to what the 1986 Council intended to accomplish.[11]

A note of caution is in order. Retroactive interpretation by legislators of their past enactments should be approached with a measure of circumspection. "The views of a subsequent Congress[12] form a hazardous basis for inferring the intent of an earlier one." *McIntosh v. Washington,* 395 A.2d 744, 750 (D.C.1978) (quoting *United States v. Price,* 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960)). *See also Holt v. United States,* 565 A.2d 970, 975 (D.C.1989) (en banc). The interpretation of statutes is, in the final analysis, the responsibility of courts, not of subsequently elected legislative bodies. *Pierce v. Underwood,* 487 U.S. 552, 566, 108 S.Ct. 2541, 2550–51, 101 L.Ed.2d 490 (1988).

In the present instance, the Council expressed in no uncertain terms its view that the trial court's decision in a pending case (*Cunningham*) had misconstrued the legislative intent. The *Cunningham* decision either had been, or was about to be, appealed. In fact, the appeal remains pending as

11. Winters relies on *United States v. Stokes,* discussed at page 572 n. 4, *supra,* in which this court, in a 2:1 decision, sustained the authority of the trial judge to sentence a defendant convicted of first degree murder pursuant to the former Federal Youth Corrections Act, 18 U.S.C. § 5010 (1970), thus exempting him from the mandatory minimum penalty. In *Stokes,* this court followed the lead of the United States Court of Appeals in *United States v. Howard,* 146 U.S.App.D.C. 10, 449 F.2d 1086 (1971), also a 2:1 decision. The decisive distinction between the present case on the one hand and *Stokes* and *Howard* on the other is that there was no aroused legislative reaction to the earlier decisions, while *Cunningham* precipitated an instant firestorm. Moreover, *Stokes* and *Howard* would have exempted only youthful first degree murderers from the mandatory minimum sentence, whereas the result for which Winters contends would apply to all of those who were sentenced prior to the 1989 amendment.

12. Or Council.

of the time of this writing. The Council's intervention could have the consequence of altering the result in a case which was still in litigation in the federal courts. The problems presented are therefore sensitive ones. They implicate the doctrine of separation of powers, and they are not at all easy.

But "[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801–02, 23 L.Ed.2d 371 (1969). This principle is a "venerable one." *Id.* at 381 n. 8, 89 S.Ct. at 1801–02 n. 8. Almost a century and a half ago, the Supreme Court declared that "if it can be gathered from a subsequent statute *in pari materia*, what meaning the legislature attached to the words of a former statute, they will amount to a legislative declaration of its meaning, and will govern the construction of the first statute." *United States v. Freeman*, 44 U.S. (3 How.) 556, 564–65, 11 L.Ed. 724 (1845). This is especially true where, as here, "[t]his enactment was evidently intended to remove any doubt previously existing as to the meaning of the statute and declare its true construction and meaning." *Bailey v. Clark*, 88 U.S. 284, 288, 22 L.Ed. 651 (1874). The views of a subsequent legislature are not conclusive as to the intent of an earlier one, but they carry "considerable retrospective weight." *Heckler v. Turner*, 470 U.S. 184, 211, 105 S.Ct. 1138, 1152, 84 L.Ed.2d 138 (1985); *see also Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 597, 100 S.Ct. 800, 814, 63 L.Ed.2d 36 (1980); *Federal Housing Administration v. The Darlington, Inc.*, 358 U.S. 84, 90, 79 S.Ct. 141, 145–46, 3 L.Ed.2d 132 (1958); 2A N. SINGER, SUTHERLAND STATUTORY CONSTRUCTION, § 49.11, at 414 (Sands 4th ed.1984).

That the 1989 Council's interpretation of the GTCA of 1986 was contained in a legislative resolution does not invalidate it. Since the Mayor plays no role in the passage of a resolution, a resolution cannot amend a statute. 1A SUTHERLAND, *supra*, § 22.14, at 216. Prior legislation may, however, be interpreted or construed by a resolution. *Id.* Moreover, the resolution in this case is altogether consistent with emergency, temporary and permanent legislation which was enacted by the Council, signed by the Mayor, and permitted by Congress to go into force. The views of the 1989 Council on the issue before us are not in doubt.

In the present case, considerable weight should be given to the 1989 legislation and resolution. Relatively little time elapsed between the enactment of the GTCA and the Council's actions in 1989. Most of the legislators were members of the Council at both relevant times. The Council responded swiftly, unambiguously and unanimously to the decision in *Cunningham*.[13] The Councilmembers provided specific and relevant details of their intent in 1986 and of what they understood existing legislation to mean. The Council's reliance on the phrase "notwithstanding any other provision of law," whether correct or not, was certainly not unreasonable. *See Illinois National Guard, supra*, and the discussion at pp. 573 to 574. The question whether persons convicted of first degree murder were entitled to good time credits was not a one-sided one. The trial judge in this case and at least two judges of the United States District Court reached a result contrary to that in *Cunningham*. *See Davis v. Williams*, No. 88–2896 (D.D.C. June 8, 1990) (Lamberth, J.); *Caldwell v. Barry*, No. 88–1394 (D.D.C. May 25, 1989) (Revercomb, J.). Under these circumstances, I think it incumbent upon us to treat the declarations in the 1989 resolution as presumptively accurate and credible; we sim-

---

**13.** With due respect to Judge Ferren, I do not see how the Council's swift and emphatic negative reaction to the *Cunningham* decision could possibly "undermine" my conclusion that the court in that case had misinterpreted the 1986 statute. As soon as they learned of it, all ten remaining Councilmembers said in no un-

certain terms that the judge's interpretation of the original GTCA was not in conformity with their intent when they enacted the statute. Surely Judge Ferren does not think that a hesitant and long-delayed declaration would be more probative of the Council's original intent than a forceful and prompt one.

ply have no reason to disbelieve the members of the Council when they expressly and unambiguously describe their initial intent.

## III

### CONCLUSION

I do not think it necessary to decide precisely how much weight the court would accord to the 1989 resolution if the statutory language, the legislative history and the administrative construction tilted forcefully towards Winters. I am of the opinion that they do not. Without the events of 1989, this would be a very close case. In light of those events, and the closeness of the question otherwise, I vote to credit the 1989 Council and sustain the judgment of the trial court.

FERREN, Associate Judge, concurring in the result:

I agree with most of Judge SCHWELB'S analysis, but I concur only in the result, not in his opinion, because I cannot accept what

I perceive to be the determinative emphasis he places on section 2(d) of the Council's Emergency Declaration Resolution of 1989 stating that the 1986 Council "never intended the [Good Time Credits] Act to apply to persons convicted of first degree murder." *Ante* at 577.

### I.

It may be true, in some instances, that "[s]ubsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 380–81, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969).[14] But many, if not most, canons of statutory construction are offset by equally forceful counter-canons.[15] Thus, it is not surprising that the Supreme Court often has said "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 331–32, 4 L.Ed.2d 334 (1960), *quoted in McIntosh v. Washington*, 395 A.2d 744, 750 n. 12 (D.C.1978).[16] Depend-

14. *See, e.g., Heckler v. Turner*, 470 U.S. 184, 211, 105 S.Ct. 1138, 1152–53, 84 L.Ed.2d 138 (1985) (1984 legislation intended to clarify current law leaves no doubt as to prospective interpretation of statute but "carries in addition considerable retrospective weight"); *Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444 U.S. 572, 596, 100 S.Ct. 800, 813–14, 63 L.Ed.2d 36 (1980) (while "views of subsequent Congresses cannot override the unmistakable intent of the enacting one, such views are entitled to significant weight, and particularly so when the precise intent of the enacting Congress is obscure") (citations omitted); *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974) ("subsequent legislation declaring the intent of an earlier statute is entitled to significant weight"); *F.H.A. v. The Darlington, Inc.*, 358 U.S. 84, 90, 79 S.Ct. 141, 145–46, 3 L.Ed.2d 132 (1958) (subsequent legislation which declares intent of earlier law is not conclusive in determining what previous Congress meant but "is entitled to weight when it comes to the problem of construction"); *Sioux Tribe of Indians v. United States*, 316 U.S. 317, 329–30, 62 S.Ct. 1095, 1100–01, 86 L.Ed. 1501 (1942) (statement in 1892 by Committee which reported "general Allotment Act of 1887, made within five years of its passage, is virtually conclusive as to the significance of that Act"); *United States v. Stafoff*, 260 U.S. 477, 480, 43 S.Ct. 197, 199, 67 L.Ed. 358 (1923) ("statute purporting to declare

the intent of an earlier one might be of great weight in assisting a Court when in doubt, although not entitled to control judicial action").

15. *See* Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to Be Construed*, 3 Vand. L.Rev. 395, 401–405 (1950).

16. *See, e.g., United States v. Mansanto*, 491 U.S. 600, 610, 109 S.Ct. 2657, 2664, 105 L.Ed.2d 512 (1989) ("postenactment views 'form a hazardous basis for inferring the intent' behind a statute") (citing *Price* ); *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 839, 108 S.Ct. 2182, 2190, 100 L.Ed.2d 836 (1988) (opinion of "later Congress as to the meaning of a law enacted 10 years earlier does not control the issue"); *Jefferson County Pharmaceutical Ass'n v. Abbott Laboratories*, 460 U.S. 150, 165 n. 27, 103 S.Ct. 1011, 1021 n. 27, 74 L.Ed.2d 882 (1983) (views of subsequent Congress form "hazardous basis" for inferring intent of an earlier one) (citing *Price* ); *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 200 n. 7, 98 S.Ct. 444, 449 n. 7, 54 L.Ed.2d 402 (1977) ("Legislative observations 10 years after passage of the Act are in no sense part of the legislative history"); *Bridgestone/Firestone, Inc. v. Pension Benefit Guaranty Corporation*, 282 U.S.App.D.C. 89, 94 n. 5, 892 F.2d 105, 110 n. 5 (1990) ("[T]he pronouncements of a subsequent Congress, here 13 years after the passage of ERISA, are notoriously

ing on the circumstances, therefore, a reviewing court may—or may not—find significance in the postenactment views of legislators who purport to express the understanding of an earlier legislature that enacted the statute at issue.

Judge SCHWELB justifies reliance on the Council's 1989 resolution to reveal the 1986 Council's intent underlying the Time Credits Act for three reasons: "[r]elatively little time elapsed between the enactment of the GTCA and the Council's actions in 1989," "[m]ost of the legislators were members of the Council at both relevant times," and "[t]he Council responded swiftly, unambiguously and unanimously to the decision in *Cunningham*."[17] *Ante* at 578. Although Judge SCHWELB'S first two reasons tend to support his argument, the third—the Council's swift, negative reaction to *Cunningham*—substantially undermines it.

I believe a postenactment declaration of legislative intent, clearly intended to affect pending litigation, is inherently suspect. Even if the declaration truly reflects earlier legislative intent, (which may or may not reflect the intent of the Mayor in signing, and the Congress in not vetoing the legislation), it appears to be intended to affect judicial review. I have no reason to believe that the motives behind the 1989 Council declaration were not entirely honorable. It is not difficult, however, to imagine that a legislative body on some other occasion—confronted by a public outcry against a trial court decision interpreting ambiguous legislation to create a very unpopular right—could conveniently, and retroactively, find an intent that had never been thought of, let alone declared, at the time of enactment, and thereby cause erasure of what the reviewing court otherwise, using appropriate interpretive tools, might have found to be a newly established right. The analysis Judge SCHWELB employs here

could apply to that kind of situation as well. From that perspective, a speedy postenactment reaction by a legislature comprised mostly of members who had voted on the earlier enactment could appear to be primarily an effort to protect the legislators' own interests at the polls, rather than to reflect their earlier intention—or more likely their earlier lack of intention—applicable to the issue later presented.

I do not go so far as to say that postenactment legislative views should never be accorded weight; clearly the caselaw permits this on occasion. *Compare supra* note 1 *with supra* note 3. I express concern here only about legislative declarations clearly intended to affect pending litigation—a situation that may present temptation to compromise honesty with expediency. Accordingly, rather than make a postenactment declaration, such as the 1989 resolution, determinative—as Judge SCHWELB does—I would relegate it to corroborative or derogative evidence at best after resolving the matter on the basis of the statutory language, aided as necessary by legislative history and applicable canons of statutory construction.

## II.

In this case we have two statutes to review. The District of Columbia Good Time Credits Act of 1986, D.C.Code §§ 24–428(a) and –434 (1989), provides:

> (a) *Every person* who is convicted of a violation of a District of Columbia ("District") criminal law by a court in the District of Columbia, imprisoned in a District correctional facility, and whose conduct is in conformity with all applicable institutional rules is entitled to institutional good time credits in accordance with the provisions of this section.... [Emphasis added.]

\* \* \* \* \* \*

unreliable indicators of the intent of Congress at the time of passage, and we give very little weight to such revisionist legislative history"); *International Union, U.A.W. v. Brock,* 259 U.S.App.D.C. 457, 463, 816 F.2d 761, 767 (1987) ("prodigious body of law establishes that 'the views of a subse-

quent Congress form a hazardous basis for inferring the intent of an earlier one' ") (citing *Price* ).

**17.** *Cunningham v. Williams,* 711 F.Supp. 644 (D.D.C.1989).

Institutional and educational good time credits shall not be applied to the minimum terms of persons sentenced under the District of Columbia Mandatory–Minimum Sentences Initiative of 1981, effective March 9, 1982 (D.C.Law 4–166, §§ 22–3202, 33–501 and 33–541).

The first degree murder statute adopted many years earlier, D.C.Code §§ 22–2404(a) and (b) (1989), provides:

(a) The punishment of murder in the first degree shall be life imprisonment.

(b) *Notwithstanding any other provision of law*, a person convicted of first-degree murder and upon whom a sentence of life imprisonment is imposed shall be eligible for parole only after the expiration of 20 years from the date he commences to serve his sentence. [Emphasis added.]

These two statutes, each containing a provision limiting early release from prison, arguably conflict with each other as applied to first degree murder. Absent § 22–2404(b), the 1986 Act, §§ 24–428(a) and –434, would make good time credits available to "[e]very person" convicted of first degree murder; and, absent the 1986 Act, no good time credits could possibly reduce the 20 year minimum sentence for first degree murder. Accordingly, because either statute would cause a different result without the other, we must construe them together. *See Holt v. United States*, 565 A.2d 970, 975 (D.C.1989) (statutory provisions having same purpose or subject matter are *in pari materia* and should be construed together). More specifically, according to the Supreme Court:

The correct rule of interpretation is, that if divers statutes relate to the same thing, they ought all to be taken into consideration in construing any one of them, and it is an established rule of law, that all acts *in pari materia* are to be taken together, as if they were one law.

*United States v. Freeman*, 44 U.S. 556, (3 How.), 564–65, 11 L.Ed. 724 (1845) (citations omitted).

Superficially, we could apply *Freeman*—viewing the statutes as "one law," *id.* at

564—and quickly conclude that "[e]very person" convicted of a District of Columbia criminal law "is entitled to institutional good time credits," provided that [1] such credits "shall not be applied to the minimum terms of persons sentenced under the District of Columbia Mandatory–Minimum Sentences Initiative of 1981," *and* that [2] "[n]otwithstanding any other provision of law, a person convicted of first degree murder" and sentenced to life imprisonment "shall be eligible for parole only after the expiration of 20 years from the date he commences to serve his sentence." The very structure of the statute fashioned by tacking together the two provisions at issue reflects a general rule subject to two compatible exceptions.

Given, however, that these statutes were enacted many years apart and that the *Cunningham* court has construed the "Notwithstanding" clause of § 22–2404(b) as applying only to "law *existing* at the time § 22–2404(b) was passed," [18] we have to inquire further into how these statutes should be deemed to relate, absent illuminating legislative history. *See ante* at 575–576.

First, I find no basis for the *Cunningham* court's conclusion that the "Notwithstanding" language of § 22–2404(b) was intended to apply only to laws in effect at the time of its enactment. It is true that § 22–2404(b) was adopted to make clear that someone convicted of first-degree murder, in contrast with second-degree murder, could not have a life imprisonment term reduced below 20 years by reference to the Indeterminate Sentences Act, D.C.Code § 24–203(a) (1989) (where maximum sentence is life imprisonment, "a minimum sentence shall be imposed which shall not exceed 15 years of imprisonment"). *See* H.R.Rep. No. 677, 87th Cong., 1st Sess. 2 (1961). But this is not to say that Congress had no intention whatsoever of protecting the 20–year minimum under § 22–2404(b) against later, more generally stated legislation that arguably could affect the penalty for first degree murder. Literally,

---

**18.** *See Cunningham, supra* note 4, 711 F.Supp.     at 646.

the "Notwithstanding" clause of § 22–2404(b) applies to subsequent, as well as to existing, laws—although with an uncertain reach.

Recently, in *Illinois Nat'l Guard v. Federal Labor Relations Auth.*, 272 U.S.App. D.C. 187, 854 F.2d 1396 (1988), the United States Court of Appeals for the District of Columbia Circuit dealt with a similar issue. The court considered whether the National Guard Technicians Act of 1968 (current version at 32 U.S.C. §§ 709, 715 (1988)), exempted the National Guards of Illinois, Wyoming, and California from the later-enacted bargaining requirements of the Federal Employees Flexible and Compressed Work Schedules Act of 1982 (current version at 5 U.S.C. §§ 6101, 6130(a) (1988)). The Technician Act provision at issue committed "establishment of work schedules to the unfettered discretion of the Secretary" of the Army, whereas the later Schedules Act required "bargaining over work schedules." 272 U.S.App.D.C. at 193, 854 F.2d at 1402. The Technician Act, however, explicitly provided that its terms were to apply "[n]otwithstanding any other provision of law." *Id.* at 192, 854 F.2d at 1401. Quoting with approval from a Third Circuit case construing a similar provision of the Technician Act with reference to an arguably preemptive provision of the later Labor–Management Relations Chapter of the Civil Service Reform Act of 1978 (current version at 5 U.S.C. §§ 7101–7135 (1988)), the court wrote:

> Looking first to the statutory language, we immediately confront the preface to section 709(e) of the Technician Act, which explicitly provides that its terms apply *"Notwithstanding any other provision of law ..."* [emphasis added]. A clearer statement is difficult to imagine: section 709(e) must be read to override any conflicting provision of law in existence at the time that the Technician Act was enacted. Application of this statement is less certain, however, with respect to a statute such as the Labor–Management Act, adopted *after* the Technician Act. The drafters of section 709(e) can hardly be said to have had the Labor–Management Act specifically within their contemplation. Even so, the preemptive language is powerful evidence that Congress did not intend any other, more general, legislation, whenever enacted, to qualify the authority of the state adjutants general as set out in the Technician Act. The language does not preclude a subsequent change of heart on the part of Congress, but it does suggest that any qualification of the terms of section 709(e) would be accepted by Congress only after some consideration of the factors requiring or permitting such a change.

*Id.* at 194, 854 F.2d at 1403 (quoting *New Jersey Air Nat'l Guard v. Federal Labor Relations Auth.*, 677 F.2d 276, 283 (3d Cir.) (emphasis in original), *cert. denied*, 459 U.S. 988, 103 S.Ct. 343, 74 L.Ed.2d 384 (1982)).[19]

Accordingly, the D.C. Circuit has interpreted a "Notwithstanding" clause identical to the one at issue here not merely to protect a statute against automatic repeal by subsequently enacted legislation covering the same field, but also to mean that a subsequent law, in order to preempt the earlier one, must reflect legislative "consideration of the factors requiring or permitting" the alleged change. *Id.*

In adopting and applying this analysis, the Circuit Court found no legislative history that indicated Congress had intended the bargaining provisions of the 1982 Schedules Act to trump the "Notwithstanding" clause of the 1968 Technician Act. The court then concluded that the earlier Technician Act provision had to apply because, according to applicable canons of statutory construction, "repeals by implication are not favored" and "a specific statute controls over a general one without regard to priority of enactment." *Id.* 272 U.S.App. D.C. at 195, 196, 854 F.2d at 1404, 1405

---

19. *Cunningham* states that "[a]ccepting the position urged by intervenor"—that the "Notwithstanding" clause could prevail as against subsequent legislation—"would mean that the Council could *never* modify former law." 711 F.Supp. at 646. *Illinois National Guard* makes clear that this statement is incorrect.

(citations and internal quotation marks omitted).

It is unclear how much the court in *Illinois National Guard* relied on the "powerful evidence" of the "preemptive language" in the "Notwithstanding" clause and how much the court premised its analysis, more generally, on canons of statutory construction absent clarifying language or legislative history. *See id.* at 194, 854 F.2d at 1403. My sense is that the court relied primarily on interpretive canons with the result made easier by the force of the "Notwithstanding" clause language in the earlier statute. I believe this approach is applicable here. Whether we focus on the subject of good time credits or more narrowly on the subject of mandatory minimum sentences, the later-enacted Good Time Credits Act is more general—more broadly applicable—than the first-degree murder statute. According to the Supreme Court:

> It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum. "Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment."
> *Morton v. Mancari*, 417 U.S. 535, 550–551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 [1974].

*Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153, 96 S.Ct. 1989, 1992–93, 48 L.Ed.2d 540 (1976) (footnote omitted); *see Rodgers v. United States*, 185 U.S. 83, 87, 22 S.Ct. 582, 583, 46 L.Ed. 816 (1902) ("It is a canon of statutory construction that a later statute, general in its terms and not expressly repealing a prior special statute, will ordinarily not affect the special provisions of such earlier statute").[20]

In *Radzanower*, the Court held that the "narrowly drawn, specific venue provision of the National Bank Act must prevail over the broader, more generally applicable ven-

ue provision of the Securities Exchange Act." *Id.* at 158, 96 S.Ct. at 1995. The Court elaborated on the Canon that "repeals by implication are not favored," acknowledging there are

> "two well-settled categories of repeals by implication—(1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act. But, in either case, the intention of the legislature to repeal must be clear and manifest...." *Posadas v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 [1936].

*Id.* 426 U.S. at 154, 96 S.Ct. at 1993. The Court then noted:

> The statutory provisions at issue here cannot be said to be in "irreconcilable conflict" in the sense that there is a positive repugnancy between them or that they cannot mutually coexist. It is not enough to show that the two statutes produce differing results when applied to the same factual situation, for that no more than states the problem. Rather, "when two statutes are capable of coexistence, it is the duty of the court ... to regard each as effective." *Morton v. Mancari*, [417 U.S.] at 551, 94 S.Ct. at 2483.

*Id.* 426 U.S. at 155, 96 S.Ct. at 1993. The Court concluded that nothing in the legislative history of the Securities Exchange Act supported "the view that Congress in enacting it gave the slightest consideration to the *pro tanto* repeal of § 94 [of the National Bank Act], let alone to indicate 'that Congress consciously abandoned its [prior] policy,' or that its intent to repeal § 94 *pro tanto* was ' "clear and manifest." ' " *Id.* at 158, 96 S.Ct. at 1995 (citations omitted).

This analysis in *Radzanower* applies *a fortiori* in cases such as *Illinois National Guard* and the instant one where a "Notwithstanding" clause warns against easy

---

**20.** I am not aware of a counter-canon of statutory construction that would affect our applying *Radzanower* and *Rodgers* here.

repeal by subsequent, general legislation. As indicated earlier, both the mandatory minimums in the first-degree murder statute, D.C.Code § 22–2404(b), and in the Good Time Credits Act, *id.* § 24–434, can mutually coexist as exceptions to the "Every person" language of the latter Act, *id.* § 24–428(a); there is no "irreconcilable conflict." *Radzanower,* 426 U.S. at 155, 96 S.Ct. at 1992–93. There is "no clear intention," express or otherwise, that the Good Time Credits Act supersede the first-degree murder statute. *Id.* at 153, 96 S.Ct. at 1992–93. Thus, this court has a duty "to regard each as effective." *Id.* at 155, 96 S.Ct. at 1993 (citation and internal quotation marks omitted).

In short, *Radzanower* and *Illinois National Guard* dictate the result here; I see no reason even to get into, let alone rely on, the 1989 Council declaration of the 1986 Council's intent. Accordingly, for reasons that differ from Judge SCHWELB'S analysis, I, too, would affirm.

MACK, Senior Judge, dissenting:

I am in complete accord with the reasoning of Judge Green in *Cunningham v. Williams,* 711 F.Supp. 644 (D.D.C.1989), that the plain language and the purpose of the Good Time Credits Act of 1986, coupled with the rules of "lenity" and logic, compel the conclusion that every person then convicted and imprisoned in the District of Columbia who engaged in conforming conduct, was entitled to receive the benefits of that legislation (with one specifically noted exception).[21] Indeed, I find much of the analysis employed by my colleague, Judge Schwelb, to add further support to, rather than to detract from, the result reached by Judge Green.

Like both of my colleagues, Judge Schwelb and Judge Ferren, I recognize that, in discerning legislative intent, it is a hazardous process to rely upon the views of a subsequent legislature to identify the intent of an earlier one. I agree with Judge Ferren, therefore, that in the circumstances of this case, it would be judicially inappropriate for us to credit the 1989 Council declaration of the 1986 Council's intent. We can no more determine the "subjective" intent of an earlier legislature than can a subsequent legislature. That is why Judge Green in *Cunningham* was correct in starting with the fundamental canon of the plain language of the GTC Act of 1986 and giving conclusive weight to that language.

Moreover, because we are here dealing with legislation which affects the length of criminal sentences, I believe it is also (constitutionally speaking) hazardous to "borrow" (as Judge Ferren has done) from the "general and specific" canons of civil statutory construction to here make the Murder I statute uniquely paramount.[22] The question is not whether there is a "counter-canon" of statutory construction that would prevent the application of Judge Ferren's approach, but whether the approach can be lawfully applied to these penal provisions. Through the *ex post facto* prohibition of the Constitution, "the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." Two critical elements identify an *ex post facto* law: it must be retrospective and it must disadvantage the offender affected by it. *Id.* at 580. The alteration of credits given as a matter of grace to prison inmates who abide by prison rules may fall within its prohibition.

In my view all persons serving sentences in the District of Columbia on April 11, 1987, pursuant to the provisions of § 22–2404(b) are entitled to earn "good-time" credits for any conforming conduct during the two year period between April 11, 1987 and May 30, 1989, which could advance the time of their eligibility to apply for parole.

I respectfully dissent.

21. See the District of Columbia Mandatory–Minimum Sentences Initiative of 1981 (D.C. Law 4–166 §§ 22–3202, 33–501, 33–541).

22. "No State shall . . . pass any . . . ex post facto Law." U.S. CONST., Art. I, § 10, cl. 1. *See Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981).